[Civ. No. 8079.   First Appellate District, Division One.—January 18, 1933.]

JACK   REYNOLDS,   Respondent,   v.   H.   P.   STRUBLE, Appellant.

Dutton & Gilkey and Lewis E. Lecara for Appellant.

Heartley F. Peart and Russel Shearer, as *Amici Curiae* on behalf of Appellant.

Jesse G. Benson and Ford & Johnson for Respondent.

PARKER, J., *pro tem.*—This is an action wherein plaintiff sought to recover damages from defendant, a practicing physician and surgeon, for and on account of alleged negligent diagnosis and treatment of plaintiff while the latter was a patient under the care of the said defendant. The case was tried in the court below by a jury and a verdict returned in favor of the plaintiff in the sum of $20,000, upon which verdict judgment was entered. Thereafter defendant moved the court for judgment notwithstanding the verdict, which motion was denied. Defendant appeals from the judgment entered pursuant to the verdict and from the order and judgment denying the motion for judgment notwithstanding the verdict.

A reversal is sought by appellant upon numerous grounds, which may be detailed as follows: 1. The evidence in the case is insufficient to justify or sustain the verdict. 2. The trial court committed reversible error in denying the motion of defendant for a directed verdict and also in denying the motion of defendant for a judgment notwithstanding the verdict. 3. Error of the trial court in its rulings on the admission and rejection of evidence. 4. Error in the instructions to the jury. 5. The verdict is excessive. The first two grounds urged necessarily involve the same points, both going to the sufficiency of the evidence.

Before outlining the facts the contention of appellant on this phase of the case may be noted. He contends that in a case such as this two things are essential to a recovery by plaintiff. The alleged negligence must be shown and also there must be evidence sufficient to connect the negligence with the claimed damage.

Plaintiff was, on November 27, 1929, a structural steel worker, following his occupation and employed upon a building being erected in Alameda County. On that date, toward the close of the day, plaintiff was repairing or closing up a hole on the fourth floor when he lost his balance and fell

through. In his fall he dropped to the second floor, going practically two stories, crashing through timbers on the way and landing against a steel column. He was a man weighing approximately two hundred pounds. Fellow workmen came to his assistance and within approximately thirty minutes the injured man was in the hospital at Hayward. His clothing was removed by a nurse, aided by the men who had accompanied him. In a short time after his arrival at the hospital the defendant doctor appeared and took charge of the case. In discussing the diagnosis and treatment up to the time the plaintiff left the hospital the defendant and appellant will be designated and referred to as the doctor. As soon as the doctor arrived he began an examination of the patient, during which he received the history of the accident and the nature of the fall. The condition of the patient, a heavy man as stated, was that of a person in extreme pain, with a severe bruise extending over almost the entire back and the left shoulder was badly contused and abrased with black and blue areas over the left shoulder blade. The patient was unable to move his left arm or lift it at all and protested with emphasis when attempts were made by the doctor to manipulate that member.

It will be unnecessary to detail the steps of the attempted diagnosis, inasmuch as it is not strenuously contended that the doctor failed in any degree of care in as far as the clinical steps went. Suffice it to say that the doctor went through all of the ordinary and recognized procedure. He tested the chest and lungs to ascertain the probability or possibility of injury or congestion; he tested the blood pressure to determine if head injury had been sustained; and he tested the urine to ascertain the reaction of the kidneys or other organs that might disclose any ill effects from the fall. Thereupon the doctor determined that it was necessary to make use of the X-ray. The touch had revealed no fractures and the swollen condition of the surface had obscured all anatomical landmarks. Accordingly a portable X-ray machine was brought to the bedside and the patient placed in a position permitting the taking of the picture. A picture was taken and the film developed and studied by the doctor. Upon the completion of the examination, including the X-ray, the doctor stated to the patient

and to his friends who were present that there were no fractured bones nor were there any broken bones. The doctor had detected some lung symptoms and stated to the patient that he should be kept in bed for a few days, about one week; the idea being to forestall an onset of pneumonia, which is frequently an aftermath of an injury such as that sustained by the patient. After two days in bed the patient regained normality in every particular save in the injured area. His temperature, respiration, lung action and general condition, aside from the locality of the afflicted area, gave normal reaction, save for a slight cough. After these two days the patient was able to attend to his natural needs and on the eighth day left the hospital. He left in an automobile in which he sat upright in the front seat, being able to walk to and from the auto. From the time of his departure from the hospital to the time of trial he had never returned to the hospital nor received further treatment from the doctor.

The fact is, as disclosed by the evidence, that at the time the injured man was brought to the hospital he was suffering with and from a series of fractures involving almost the entire structure of the left shoulder and its inclusive processes. It will not be necessary here to detail with anatomical accuracy the exact nature of the injury. The structure of the shoulder includes the cavity wherein rests the head of the humerus (being the long bone of the upper arm) and likewise includes the acromion process which is the highest point of the bony structure commonly referred to as the shoulder tip. Attached to the structure or adjacent thereto and being a part of the functional mechanism is the clavicle or collar-bone and the scapula or shoulderblade. Lying somewhat under the acromion process is the coracoid process. The negligence and lack of skill charged to the doctor rests upon his alleged failure to discover the true condition existing. It is, as indicated hereinbefore, not claimed that any lack of skill was shown up to the time of the X-ray picture, though plaintiff does not admit there would have been a skilful diagnosis without the use of this agency. But we may pass the questions arising under this head. Whether or not a skilful diagnosis required the use of the X-ray, the undisputed fact is that such a picture was taken.

While the doctor, after reading the developed film of the X-ray picture, decided that there was no fracture present, the X-ray picture discloses a fracture of the neck of the scapula, with an inward and downward displacement. Much medical testimony was adduced by both sides on the subject of this X-ray picture. It seemed to be almost the unanimous conclusion of the experts that the picture was not of the highest type in clarity and detail and likewise it seemed agreed that such a picture would not be accepted as a basis of diagnosis by a doctor possessed of ordinary skill practicing in the community wherein the case arose.

Notwithstanding the lack of detail and disregarding the claimed imperfections in the picture, the evidence almost conclusively shows that there was sufficient clearness and detail to disclose the presence of a fracture. One witness for the plaintiff, in all respects qualified, testfied that the fracture was so obvious that a two-year medical student would have no difficulty in locating it on the picture. The picture was in evidence and displayed to the jury. The witness, before the jury, with pencil, outlined the fracture on the picture and even the witnesses apparently most favorable to defendant conceded that sufficient did appear to demand further pictures. There was more than sufficient testimony adduced by both sides to almost demonstrate that the picture showed plainly a fracture. Witnesses whom the record would indicate to be men of high standing in the medical profession, called as witnesses for the defendant, when shown the picture would not deny that fact.

It is the contention of appellant in this regard that the reading of an X-ray film or negative involves to a large degree the opinion and judgment of the person reading the same. And, argues appellant, a doctor or physician cannot be held accountable for an honest error in drawing a conclusion on such a matter. Such may be conceded to be the law, within certain limits. Yet, in forming an opinion and acting thereon a physician is presumed to have and is chargeable with ordinary skill and knowledge possessed by practitioners in his community. The existence or non-existence of things visible to the eye, with reference to material objects, is not a matter of opinion, and necessarily cannot be. It would seem absurd to say that a surgeon looking at a bleeding wound could claim the benefit of an

opinion that there was no wound. We are satisfied that there was sufficient evidence before the jury to warrant the finding that in making a diagnosis of the plaintiff's injuries the defendant doctor failed to use and exercise that degree of care, skill and learning ordinarily possessed and exercised by physicians or surgeons practicing in the same locality.

It might be noted, in view of what has been said regarding the imperfections of the X-ray, that defendant doctor steadfastly contends that the picture was clear and good, though lacking in a detail that could be secured only through a more elaborately constructed machine. This, of course, reflecting the doctor's own conduct, would make the unskilfulness more apparent.

The contention is made, and it seems to be conceded, that the condition of the patient demanded great care, aside from the question of the fractured parts. In other words, the general condition of a man after the history given might be such as to relegate the fracture to the rank of a comparatively minor injury. The claim follows that in taking the X-ray the purpose thereof was solely to get a chest picture in an effort to visualize the lung condition or other internal hurt, if any, and that therefore the disclosure of the fracture was but incidental in the picture. However, it is shown by competent testimony that any picture of the chest, taken as was this one, would necessarily show up the scapula.

And it is likewise in the record, beyond dispute, that the exercise of ordinary skill and care such as possessed by physicians and surgeons practicing in that community would have required further examination and the taking of further X-ray pictures to determine the true condition of the patient. It is admitted that there may be sufficient reasons which would prevent further examination or at least defer it. Foremost and perhaps the principal reason is the condition of the patient. It is shown and conceded that there is always a certain element of risk in moving a patient, in the condition of plaintiff at the time; that many elements combine to make this risk, including shock, pain and danger of pneumonia. The question, then, of further examination becomes a question to be determined by the doctor in charge, in each particular case. Yet the record before us discloses

sufficient evidence to warrant the jury in finding that none of these conditions were present in the instant case. The patient was able to and did move about the room, his temperature, respiration and pulse became approximately normal and his appetite and sleep combined with the other normal symptons to remove any anticipated danger in further examination. During the time the patient remained in the hospital, the record discloses that nothing was done for him along other lines of treatment other than rest and general care. The undisputed fact is that he lay there during that period with almost the entire structure involving his left shoulder broken down and disorganized, constantly complaining of pain in those parts, and no effort at all being made to locate the cause of his trouble, due entirely to the lack of care and skill of the physician to interpret or read the X-ray which demonstrated the trouble. And then, when he did leave the hospital, it was with the consent of the doctor and with his knowledge and at that time the doctor again told the patient that he had suffered no fractures. Much is said and much testimony was introduced concerning the point as to what ordinary care and skill would have required if the doctor had discovered the fracture. The point is urged that had the fracture been observed and a complete and proper diagnosis made it would have become a matter of personal judgment with the doctor as to whether or not he would have done anything other than he did. On this phase of the case the point is immaterial. Just where diagnosis ends and treatment begins may become a mooted question, but to us it seems obvious that diagnosis terminates only when the physician learns at least to his own satisfaction the nature of the ailment. And it seems to be true from the record before us that the purpose of detaining the patient in the hospital, among other things, was to note developments and for further examination. As hereinbefore indicated, nothing further did develop and the original diagnosis of mere bruises and contusions remained the diagnosis with which the patient left the hospital. There is evidence warranting a finding of the jury that if the fracture had been discovered, then ordinary care and skill such as possessed and used by physicians practicing in that locality required that steps be forthwith taken to accomplish a reduction or replacement.

There is further evidence that ordinary skill and care required the use of the X-ray as an essential aid to a skilful diagnosis, employing that skill and care possessed and used by the ordinary practitioner in that community. ▮ Indeed, it might be almost said that the use of the X-ray as an aid to diagnosis, in cases of fracture or other indicated cases, is a matter of common knowledge. ·Even the layman, when injured, of his own accord seeks the X-ray. And under the rule of *Jacobson* v. *Massachusetts*, 197 U. S. 11 [25 Sup. Ct. Rep. 358, 49 L. Ed. 643, 3 Ann. Cas. 765], the court could, in the absence of testimony, take judicial notice of this scientific advancement.

We have no hesitation in holding, under the evidence adduced, that there is sufficient in the record for the jury to have concluded that when the patient left the hospital, in the condition in which he was, that he was then the victim of the unskilful diagnosis and that he had not received that skilful care which the doctor impliedly held out to him. Further, there is evidence that the fractures existing could, with ordinary skill and care, have been reduced and a functional arm result. And still further is there testimony that the present useless condition of that arm is the result of the failure of the attending physician to discover and reduce the fractures; of which more hereinafter.

▮ On this phase of the case we meet the constant argument that the charged negligence involves matters of judgment and opinion on the part of the physician, for errors of which he cannot be held liable in damages. We have no quarrel with the principle of law that a physician cannot be charged and held on mere errors of judgment or for erroneous conclusions on matters of opinion. However, he must use the judgment and form the opinions, not of a layman, but of one possessed of knowledge and skill common to medical men practicing in the same or a like community. That a practicing physician may have done his best is no answer to an action of this sort. The law has fixed a standard, liberal to the practitioner and easy of fulfillment. We pass, then, this phase of the case.

▮ The second essential is that there must be a causal connection between the negligence and the injury; in other words, the rule of proximate cause.

The plaintiff charges his present condition to the found lack of skill. It then becomes important to disclose his condition. The plaintiff has forever lost the use of his left arm as a useful working member. There may be some slight value thereto, but it seems agreed by all of the medical witnesses that the use to be gained from the arm is practically nil. Again, the medical authorities are in seeming accord as to the conditions existing which bring about this result, as far as the mechanism is involved.

Anatomically speaking, the structure of the human body is such that the mere framework on the living being is by itself of little more value than the same framework on the cadaver. Motive power and muscular control are required to animate the structure. The large muscle which controls the action of the upper arm is called the deltoid muscle. This muscle is in turn energized by a nerve structure, the chief nerve being the circumflex nerve. We find it needless to attempt any scientific nicety as to all of the various muscles and nerves which either directly or remotely combine with those named in the supplying of power and control to the parts involved. The medical testimony likened the human system to the distribution of electric power with the creation and distribution of energy and included many factors, each intimately connected in the scheme. Yet all agree that with the destruction of this deltoid muscle or at least the complete impairment of its use and power, the arm is and will remain useless. And they all agree that this muscle is almost completely gone. It is plaintiff's theory and claim that the muscle has become atrophied through disuse. This theory reasons out as follows: The original injury was such that the force of the fall drove downward and inward the shoulder bones and the processes thereunto attached, including the scapula, the acromion and the glenoid fossa, the latter being the cavity wherein rests the end or head of the large bone of the upper arm. The deltoid muscle, in normality, is of certain elasticity and tension and of a length sufficient to function in accord with the mechanical design of leverage with the arm and the joints or bony structure of the shoulder. By driving the upper processes inward and downward the distance between the termini of the operating ends of the muscle was shortened, leaving, as it were, a slack in the muscle. With the tension

removed the muscle could not within itself contract and relax and even if energized to the capacity of the supplying nerve could not tighten to the point required to function. Explanatory, without the anatomical nicety, the situation would be somewhat visualized by comparing a rope of ten feet in length with its ends attached to points only eight feet apart. A contraction of one foot in the rope would, obviously, apply no power to either end. Through the consequent disuse of the muscle, contends plaintiff, it has become atrophied and this atrophy has been of such long standing as to preclude recovery of function without deep and somewhat experimental surgery, which, it is agreed, should not be undertaken at this time.

Appellant's theory is somewhat different. It is his contention that the muscle has become paralyzed through loss of nerve energy. The argument, supported by medical testimony, is that the original injury caused certain injuries to the nerve structure with the result that some of these energizing nerves were either severed or bruised to a point of degeneracy; that for this reason the nerve supply has been cut off from the muscle, bringing about both paralysis and its consequent atrophy from disuse. There was a direct conflict of evidence on this feature and evidently the jury chose to adopt the views of the medical witness for the plaintiff. Indeed, at the trial a demonstration was had for the benefit of the jury with the purpose of showing that the claimed dead nerve yet functioned and did supply energy to the muscle.

Going further on this disputed point of causal connection or proximate cause, appellant contends that the opinion of a medical or other expert stands or falls upon the reasons given for his conclusion. Plaintiff's witness testified that the present condition of the plaintiff was due to the failure to discover and reduce the fracture conceded to have taken place in the body of plaintiff. The reason he assigns for this is that almost immediately upon the fracture of a bone in the human body nature starts to repair and heal the damage. Given such a fracture the process nature adopts is to immediately throw out a callus, liquid in form at the start, with which to cement the break and restore a complete bony unit. As time goes on this fluid so thrown out begins to harden, gradually becoming of a bony hardness and in

reality new bone. However, while healing of the bone is thus effected, there is no replacement or restoration to alignment. The break is healed in the same position as left by the fracture. If the bones were displaced, or as in the instant case thrown downward and inward, they would remain in that position, though healed and united by new bone. The muscles and ligaments attached to these bones would hold them firmly in the position of displacement and reduction could not be accomplished, and in this case was not accomplished due to the negligent delay. The witnesses for the defendant were surgeons who had attended plaintiff commencing at a period three weeks after the accident and approximately two weeks after he had left the hospital where he had been in the care of the defendant. These doctors testified that when plaintiff came under their care there was not a single bad result present from the failure to have reduced the fracture. They testified that there was no bony union present and that the shoulders were in normal apposition, the left shoulder being in uniformity with the right in location. They detected a still present swelling, which it was found necessary to reduce and outer inflammation which they undertook to allay. Their X-rays disclosed the fractures noted and the same pictures disclosed to them the complete absence of bony union. They agree that the fractures subsequently healed without reducing the fractures and agree that this process of healing was accomplished by nature through means of the union hereinbefore discussed. But, they testify, this union did not take place until many weeks after. They repeat, strenuously, that the condition they found was in nowise aggravated through the delay in treatment and that they found the same condition in all respects as would have been present at the outset without aggravation or increased involvement of any sort. They testify that as far as the bony structure of the shoulder is concerned, while slightly out of placement, yet it is in all respects as good as new and that the helpless condition of plaintiff is not due to any bone or structural defect but due to the loss of muscular power to operate the mechanism; this, to repeat, being due entirely to the lack of nerve supply. This nerve condition, they testify, was apparent to them on the patient's first visit. And, they aver, this condition resulted from the fall and the impact

thereupon resulting, and the delay in diagnosis and attempted repair in no way or manner nor in any degree contributed to the damage they found.

We have thus presented a conflict in the evidence, the opposing theories each resting on either actual or assumed facts. The appellant argues strenuously that this conflict is but apparent. His reasoning, in the main, is based upon the cases cited as follows: *Winthrop* v. *Industrial Acc. Com.*, 213 Cal. 351 [2 Pac. (2d) 142], *Thoreau* v. *Industrial Acc. Com.*, 120 Cal. App. 67 [7 Pac. (2d) 767], and *Singer* v. *Industrial Acc. Com.*, 105 Cal. App. 374 [287 Pac. 567].

It will be noted, before further discussion, that all of these cases arose under the Workmen's Compensation Act and the rule of decision necessarily liberal in order to effectuate the intent of the statute. The rule announced in those cases may be taken from the Winthrop case. There it is stated that physicians who have made physical examination of the affected area and have treated petitioner have before them the original evidence which is not before the physicians who give their opinions based on a statement of facts without opportunity to investigate the original condition attempted to be described. Following out the rule the court held that the testimony of the physicians testifying without having had the opportunity of investigation of the original condition did not have the effect of creating a conflict with the testimony of the physicians who had made the original examination and who had before them the original evidence. Expressed in a different way, mere conclusions will not serve to meet the definition of substantial or any evidence as against positive, direct evidence of a fact.

However, the same situation is not present in the instant case. The evidence of plaintiff's medical expert was based upon an X-ray picture of the scapula taken on the very day of the accident and on pictures subsequently taken showing the exact nature of the injury. He testified from this picture that the shoulders were out of balance and that the left shoulder was impacted downward and inward. The testimony of the physicians who attended later was that no such condition existed and they too presented X-ray pictures to support their claim. Both sides relied, to a great extent, upon these pictures. The testimony of both sets of doctors was illustrated and explained through the use

of these various X-rays and what each picture disclosed was explained to the jury who had the pictures before them. The claim of plaintiff was not only that a union would have been created which would make reduction difficult if not impossible but also that the muscles and ligaments and soft tissue would combine to hold in misplacement the disturbed bones. The testimony of the physicians who attended the plaintiff three weeks after the accident was that no union had formed. This conclusion, as noted, was based to the larger part upon the X-ray pictures. However, it was admitted that such a picture would not disclose a union until the same had become of the substance of bone. In other words the callus, if even to the hardness of cartilage, would not reveal itself to the X-ray machine. Neither set of medical witnesses ever went inside to find the exact location of the bones or the muscular surrounding that maintained the offset. When the first picture disclosed the downward and inward position and the irregularity of shape and the latter pictures disclosed the same situation and the present physical examination of the patient likewise disclosed a similar situation we cannot say that the jury was bound to accept the statement of the attending physicians that at a time in between the case was entirely different.

On this phase of the discussion there enters another question. It has been and is an old stock instruction which almost every trial judge gives to a jury that they are the sole judges of the weight to be given the testimony of any witness and that it is for the jury to determine the credibility of the witnesses. The instruction goes further and tells the jury that this power of weighing the testimony and determining the credibility of the witnesses is not an arbitrary power but is to be exercised in conformity with certain rules of law. The jury is then told that they may consider the demeanor of the witness on the stand, the reasonableness or unreasonableness of his testimony, his motives, if any, and his interest. Also they may consider whether or not his testimony is contradicted. That this is sound law and a sound rule of practice cannot be questioned.

In the instant case the witnesses testifying for the defendant on the points under discussion did display a direct

interest in the outcome of the case. One testified that he
was unalterably opposed to malpractice cases, regardless of
the facts. Almost all of them testified that they were acting
without fee or charge as a professional duty, as it were,
to repel the inference that might arise against physicians
and surgeons as a class. It was shown that some of the
medical witnesses had approached the plaintiff's witness
and attempted to intimidate him or at least to dissuade
him from testifying under pain of ostracism. Also it ap-
peared that the physicians who upon the first examination
of the plaintiff found the nerve injury did make an exten-
sive report of their findings, embracing some thirty or more
pages, and a careful scrutiny of the report failed to disclose
a single mention of any nerve impairment. Also it was
before the jury that these same physicians began their
treatment by putting the arm in what was designated an
airplane splint, the stated object being to remove the bony
structure from muscular interference, leaving the obvious
query as to what interference might be expected from a
muscle already dead.

From these and various other considerations including
the demeanor of the witnesses and the manner of testifying,
we cannot say what weight the jury gave to the testimony
of the various witnesses. If the jury concluded that medical
experts were before them in some sort of united effort to
pull the case out of the fire as a matter of professional
pride or interest they would naturally discount the testi-
mony to some extent. And beyond the jury's verdict we
find the action of the trial judge, upholding the verdict,
both on motion for a judgment for defendant notwithstand-
ing the verdict and on motion for a new trial.

While, as we have stated, the law requires proof of both
negligence and causal connection of the proven negligence
with the injury, yet there is no hard-and-fast rule as to the
quality or quantity of proof. We quote from *Barham* v.
*Widing,* 210 Cal. 206, 215 [291 Pac. 173, 177], as follows:
"After the verdict of a jury has been fairly rendered, all
the circumstances of the case, together with every reason-
able inference which may be drawn therefrom, will be mar-
shaled in support of the judgment. Because of the very
subtleness of the origin and development of disease, less
certainty is required in proof thereof." Quoting then from

*Dimock* v. *Miller*, 202 Cal. 668, 671 [262 Pac. 311], we find: "If . . . it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science." And in *Ley* v. *Bishopp*, 88 Cal. App. 313, 316 [263 Pac. 369], it is held that it is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion. It is sufficient if there is substantial evidence upon which to reasonably support the judgment. We therefore conclude that the evidence is sufficient on both branches, namely, negligence and proximate cause.

What has preceded sufficiently answers the claim of error in the refusal of the court to direct a verdict for defendant and the alleged error in denying defendant's motion for a judgment notwithstanding the verdict.

We will now take up seriatim the other grounds set forth in appellant's claim of prejudicial error requiring a reversal. The point is made that the trial court committed reversible error in permitting respondent to propound hypothetical questions which were based on facts not only not in evidence but directly in conflict with all of the evidence. We have examined the record and find the point without merit. The complaint is based mainly on questions asked in cross-examination after the witness had answered the hypothetical question first propounded by appellant. It is a well-recognized rule of cross-examination that different aspects of the subject may be gone into for the purpose of testing the knowledge of the witness and different phases of the subject embraced within the hypothesis may be developed.

It is next urged that error warranting reversal resulted in the court's allowing the examination of a doctor, called by appellant, relative to his omission to divulge certain information to the respondent. Without conceding the error, we cannot say that it is of any moment in the instant case. In any event, the point is misstated, inasmuch as the error complained of was not on the fact of failure to divulge information to respondent but was on

the question as to whether or not the doctor, who had attended the plaintiff, had received the latter's consent to testify. To repeat, we find no prejudicial error.

■ The next claim is that the court committed reversible error in allowing respondent to examine a doctor from a medical text-book. The record does not bear out the appellant in his statement of the fact. The matter was called to the attention of the trial court and it was held that plaintiff's counsel was not doing the thing complained of. Indeed, we know of no rule or practice that would prevent counsel from being intelligently advised as to the accuracy of his questions.

■ Complaint is next made that the trial court committed reversible error in allowing respondent to propound various questions to expert witnesses which assumed a standard which the law does not set up. The transcript discloses that throughout the trial there was an interchange of terms and phrases. Often, instead of using the term or phrase "that degree of skill, care and learning ordinarily possessed and exercised by physicians or surgeons practicing in the same or similar localities" both counsel dropped into the shorter terms of "average physician", "ordinary doctor", "reasonably prudent physician or surgeon", etc. At one stage of the trial an understanding was had between counsel that instead of using the long term that they use the term "the ordinary doctor". This understanding was unequivocal and explicit. Surely if it did no harm thereafter it could have done none before.

The next point may be passed without comment inasmuch as an analysis would extend to great length and involve purely academic discussion. Here again, conceding error, no harm resulted therefrom nor was any right, substantial or otherwise, taken from the defendant or prejudiced.

■ It is then urged that the trial court committed reversible error in refusing to grant appellant's motion to withdraw certain issues from the jury. The point arises with reference to the injury to the coracoid process. This may be described as a small protuberance on the scapula, being one of the three bones of the shoulder. The testimony of plaintiff's witnesses disclosed that no injury resulted to plaintiff from any failure of care with respect to this process. Accordingly, at the time of the closing of the

case, appellant requested or moved that this issue with reference to the coracoid process be withdrawn from the jury. The motion was denied. Without detail it may be stated that this process is a part of the structure of the shoulder and while it might not have been subject to reduction after fracture, yet it did remain a part of the structure out of placement. We cannot hold that the trial court would have been warranted in this case in outlining the anatomical structure of the plaintiff and narrowing the issues to any one or more bones.

The next complaint goes to the instructions. The first instruction criticised is the one defining negligence of a physician. Without quoting the instruction we find no fault therewith. All negligence is relative, whether negligence of a physician or negligence of a person in any other walk of life. The first element of relativity, and perhaps the whole of it, is a fixed duty, or a degree of care fixed by law. While the instruction is general, it is admittedly preliminary and definitive. Further on in the instructions the subject was completely and exhaustively and correctly covered.

The next instructions are in the form of a direction to return a verdict for defendant. Sufficient has been said hereinbefore to dispense with further discussion on this point. The last instructions criticised and made the basis of reversal involve the question of pain and suffering. Appellant strenuously maintains that there was no sufficient distinction made between pain and suffering following and resulting from the accident itself and that claimed to have followed from the alleged negligence. Likewise it is urged that there was no evidence on the subject warranting the giving of any instruction thereon. Taking up the last contention it would be readily apparent that there was much from which a jury might infer pain. The testimony was, as we have found, sufficient to charge the unfortunate condition of the plaintiff to the negligence alleged, inasmuch as the result of such negligence was the continuation of the fractured and generally disabled state of plaintiff. No inference of resultant pleasure could follow from the evidence of the subsequent treatment. Nor could aught but pain and distress be inferred from the three weeks' delay in treatment. In addition thereto was the evidence of the

physicians as to the pain expressed and the swelling present and permitted to remain. *Kinnear* v. *Martinelli,* 84 Cal. App. 721 [258 Pac. 686], supports the rule that instructions may be based upon reasonable inference from the evidence disclosed by the record. ▇ On the point that the court did not clearly distinguish as to the source of the pain suffered we find that the specific instructions brought to our attention by appellant constitute but a part of the instructions given. By a somewhat strict construction the portion submitted by appellant might bear out his contention. But no rule of law is more settled than the rule providing that the instructions must be read as a whole. Upon a study of the instructions, taken as a whole, we find the subject fully and intelligently covered and the jury specifically instructed that recovery could be had for such pain and suffering as followed and resulted from the alleged negligence of defendant as distinguished from the pain ordinarily to be expected from the accident. We find further that the instructions are not tainted with the vice of conflict, nor are they misleading.

▇ The last point urged is that the verdict is excessive. Given the finding that the complete helplessness of the plaintiff resulted from the negligence alleged, we cannot assume for ourselves that a portion thereof would naturally result from the original injury. The plaintiff was a man forty-four years of age, with a wife and minor son. He was a structural iron worker earning eleven dollars per day and working five and one-half days per week for ten months in the year. His expectancy was approximately twenty years. His earnings over the period of expectancy would exceed $50,000, and if we cut the period of expectancy in half, to allow for the inability of age, we find an earning capacity in excess of $25,000. Aside from this there are certain other elements of damage well embraceable within the amount awarded. The plaintiff did suffer pain; there would be a continuing pain, either mental or physical, perhaps both. In fact mental pain or anguish cannot by any process of law or medicine or kindred science be separated from purely physical pain and suffering. His status in the social order is completely changed. He is, as it were, one of the wrecks of industry. With all of these things in mind we cannot arbitrarily pronounce the amount

of such proportion as to indicate passion or prejudice on the part of the jury. The law respecting the powers of a reviewing court on the subject of an excessive award is to the effect that the excessive nature of the award must be apparent. And further the rule is announced, that much is left to the discretion of the trial judge in determining whether or not the sum awarded is unjust and excessive. Further, it was shown that the plaintiff was already impaired in the use of his remaining arm so that his present situation is one of utter and complete disability.

The judgment is affirmed.

Knight, Acting P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 17, 1933, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 17, 1933.