AGUSTÍN RAMOS ORENGO, Plaintiff and Appellee, *v.* GOVERNMENT OF THE CAPITAL OF PUERTO RICO, Defendant and Appellant.

No. R-62-182.     Decided May 9, 1963.

*Hartzell, Fernández & Novas,* and *A. Santiago Villalonga* for appellant. *C. H. Juliá* and *A. R. Díaz* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

PER CURIAM: The facts of this case are simple. On September 17, 1959 appellee Agustín Ramos Orengo was removed by Carlos Juan Medina Rivera to the outpatient clinic of the Government of the Capital in Barrio Obrero, Santurce, Puerto Rico, because the night before he had been taken ill with vomiting and diarrhea. From the taxicab he was placed on a wheel stretcher and taken to clerk Esther Carbonell de Reinosa who referred him to nurse Santa Rivera because it was an emergency case. The latter referred him to Dr. Benliza who instructed her to prepare him for examination while he finished attending another patient. Nurse Rivera then proceeded to take off his shirt.[1] The patient had been quiet, "as if he were unconscious." All of a sudden he raised his feet, turned over and fell from the stretcher receiving a

---

[1] As to the liability for a nurse's actions, see *Castro* v. *Municipality of Guánica,* 87 P.R.R. 690 (1963).

blow on the forehead. Dr. Benliza and a graduate nurse came immediately to help him, administered emergency treatment and first aid to stop the hemorrhage, but since he was having epileptiform convulsions the physician ordered an intramuscular injection of five grams of luminal sodium which was administered to appellee. Appellee was placed on another stretcher, the admission blanks were filled in in order to refer him to the municipal hospital for X rays of the skull, suture of the forehead and whatever treatment might be necessary. Appellee testified that when he was placed on the stretcher after the fall in the outpatient clinic his knee was swollen and the blood in the thigh was black and blue; that he was not administered treatment during the five days he was confined in the municipal hospital. All they gave him was food. They told him they were going to operate on him on the sixth day, but on the fifth day a social worker from the Veterans' Administration who went to see him called San Patricio Hospital and they sent an ambulance, picked appellee up and removed him to that hospital. On the sixth day he was operated on for a fracture of the patella of the left leg and placed in a cast. He remained 15 days in that hospital, after which he remained in bed in his home for 40 days; he returned to the hospital where they removed the cast, gave him crutches and instructed him to report two or three times a week for electric lamp treatment for a period of 20 to 25 days. He used crutches for about four months. He also testified that in the municipal hospital he experienced and complained of pains in the affected leg, did not sleep well, but that they did nothing for him there. The leg was crippled and at the time of the hearing of the case, according to appellee's testimony, he still experienced pains.

The trial court concluded that the fracture in question would not have occurred if the outpatient clinic employees had exercised due care and diligence to protect appellee so he would not fall from the stretcher, which constitutes negli-

gence. It further concluded that with proper medical treatment and due care appellee would not have experienced such severe and distressing pains during the five days he remained in the municipal hospital with his black-and-blue fractured knee. The court therefore estimated that the sum of $5,000 was just and reasonable compensation for the personal damages, physical suffering and mental anguish experienced by appellee and $300 as compensation which he failed to earn for several months' work which he could not perform. Consequently, the trial court ordered the Government of the Capital to pay to appellee the sum of $5,300 plus $500 for attorney's fees.

In its petition for review which we granted on August 7, 1962, appellant assigns three errors of which we will discuss two in the course of this opinion.

*FIRST ERROR:* "The trial court committed gross error of law in concluding that it was defendant's duty to exercise continuous vigilance over plaintiff while he was in the outpatient clinic of Barrio Obrero."

We cite, with approval, the following from appellant's brief:

"In the discussion of its conclusions of law the trial court stated as follows:

'In our opinion, the patella of plaintiff's left knee would not have been fractured if the employees of the outpatient clinic of Barrio Obrero had exercised due care and diligence to protect the patient. When a patient is confined in a clinic, it is the latter's duty to determine his condition and to give him due assistance in order to protect him in accordance with his condition. *It was the duty of the officers and employees of the outpatient clinic to exercise due diligence in order to determine the degree of care and continuous vigilance so he would not fall from the stretcher. The lack of such ordinary care constitutes negligence.'* " (Italics ours.) See *Statement of the Case, Findings of Fact and Conclusions of Law,* p. 6.

"This conclusion of the trial court presupposes that the nurses who attended plaintiff in the outpatient clinic of Barrio Obrero should have anticipated the possibility of the occurrence of the accident. The court's reasoning seems to be predicated on the doctrine of *Hernández* v. *The Capital*, 81 P.R.R. 998, in which it was established as a standard of conduct for hospitals in connection with their patients that they owe the latter the reasonable care and attention required by the circumstances, and that such standards of care and attention are measured by taking as a guidepost the practice prevailing in the community and considering the specific conditions of the patient which are controlling in each case."

However, the trial judge did not rely on the case of *Hernández, supra,* but on those of *Roses* v. *Juliá,* 67 P.R.R. 485 (1947); *Carrasquillo* v. *Am. Missionary Association,* 61 P.R.R. 837 (1943); and *President and Director of Georgetown College* v. *Hughes,* 130 F.2d 810 (D.C. Cir. 1942).

In *Carrasquillo, supra,* we held that the burns suffered by a newly born baby as a result of two hot water bags placed by a nurse in the cradle was not an unavoidable accident, since by the exercise of reasonable care on the part of the nurse and the physician who attended the patient and the child in order to determine whether the cradle was at the proper temperature, the accident could have certainly been avoided. In this case, citing that of *President and Director of Georgetown College, supra,* we also held that a hospital is liable for the damages sustained by the child as a result of the negligence of its employees, notwithstanding the fact that the hospital renders gratuitous services to insolvent patients. In *Roses, supra,* a patient who was suffering from involutional psychosis, with a special tendency to suicide, was hospitalized in defendant's clinic. She escaped from her room, climbed to the terrace of the building, and from there she fell or jumped to the ground, suffering bruises and wounds as a result of which she died the same day. We upheld the trial court's conclusion in this case in the sense that the

patient's death would not have occurred if defendant's employees had exercised due care and diligence to protect the patient. In this case defendant had been informed by the patient's husband, who was a physician, that "the nervous phenomena which he had observed in her made him consider her as a potential suicide." In *Hernández, supra,* we reaffirmed the doctrine announced in *Serra* v. *Transportation Authority,* 67 P.R.R. 574 (1947), to the effect that the Government of the Capital is liable for the negligent acts of its employees and officers performed in the discharge of their duties, even when such negligent acts are committed in rendering services which, as in the present case, are offered gratuitously.[2] We further held that a public or private hospital is not an insurer of its patients against injuries inflicted by themselves or caused by other persons; that the hospital owes the patient the reasonable care and attention required by the circumstances, and that these are measured by the standards of reasonability and prudence; that on certain occasions the hospital may be required to adopt precautionary measures additional to the ordinary ones and which may even include continuous and uninterrupted vigi-

---

[2] The new Municipal Law, No. 142 of July 21, 1960 (21 L.P.R.A. §§ 1601–1603), confers jurisdiction to the Superior Court, on motion of a party, to grant, through ordinary action, compensation for damages to parties injured by acts or omissions of municipal officers or employees through malice or inexcusable negligence or ignorance. *Any person having any claim against a municipal corporation* for damages to the person or property, caused through the fault or negligence of the municipal corporation, *shall present to the chief executive of the municipality a written notice* setting forth clearly and concisely the date, place, cause and general nature of the damage sustained, the amount of monetary compensation or the type of remedy adequate to the damage sustained, the names and addresses of his witnesses and the address of the claimant as well as the place where he received medical treatment for the first time. *Such notice, which may be served personally or by registered mail, shall be presented within 90 days following the date on which the claimant learned of the damages he is claiming, and no judicial action may be instituted against a municipal corporation for damages caused by the fault or negligence of the latter if written notice thereof is not given within the term prescribed.* (Italics ours.)

lance of the patient, as in the case of patients with diverse manifestations of mental derangements or deficiencies, or who are delirious, epileptic, or in a state of complete or partial unconsciousness caused by the use of drugs or anesthetics; and likewise, that the standards of higher diligence govern the conduct of the hospital where sick children are concerned and, by reason of the child's age, a higher degree of care and attention is required and it must increase if abnormal reactions caused by the disease are added to the incapacity of age. In this case we specifically concluded that the death of a three-year old child suffering from meningitis, when hanging by the string of her nightgown which was caught in a screw when the child had apparently tried to climb down from the cradle in the municipal hospital of the Government of the Capital, was due to the negligence of the hospital employees. We then said that: "This is the case of a three-year old child, who although her condition had improved, was still suffering from meningitis, in a feverish and very restless condition, and for all these reasons, completely unable to care for herself. The hospital had full knowledge of her disease and condition and the nurse who attended her at the time of her death knew that at least once the child had left her crib and climbed atop a folding screen in a situation of grave hazard. That nurse likewise knew that the child had been very restless some minutes before the accident, to such a degree that she deemed it proper to tie her hands and feet to the side rails of the crib. She also knew that when she untied her the child had not fallen asleep but was 'apparently quiet' and that according to her experience children usually assume that condition of stillness when they are untied 'because they are afraid to be tied again.'

". . . The nurse was outside the room, busy changing the serum of one of the very sick patients, in a position where she could observe the adjoining room through a glass,

but not Marta Iris directly. As a matter of fact, she did not look at Marta Iris while performing the said task.

"We believe that the hospital could have given Marta Iris the protection and care required by her condition by the use of certain simple measures at a minimum cost. Thus, for example, it could have assigned an additional nurse at the time when the aide was outside the ward or when there were several patients who required special vigilance; it could have grouped the latter in such a way that upon assisting one of them the nurse could, at the same time, watch the others closely; and provided cribs so equipped as to make it impossible for restless children to get down."

■ The facts in the case under consideration are entirely different from those which we considered in the cases which we have just analyzed. Neither the specific acts which caused the injuries in *Carrasquillo, supra,* nor the knowledge of the patient's mental condition which defendant's employees had in *Roses, supra,* nor the very special conditions which existed in *Hernández, supra,* are present in the instant case. On the contrary, the evidence is rather to the effect that when appellee arrived at the outpatient clinic he was quiet, weakened to such an extent that it was necessary to carry him on a wheel stretcher, and that at the very moment the nurse was taking off his shirt in order to prepare him for medical examination, suddenly and unexpectedly he turned over and fell from the stretcher. At no time was appellee left alone on the stretcher; on the contrary, he fell from it while he was being attended. The trial judge concluded that the injection was administered after he fell, so that the latter was not caused by the former. As we stated in *Hernández, supra:*

■ "The duty of foreseeability does not extend to all the hazards imaginable which could conceivably threaten the patient's security but to those which are likely to happen and which can be anticipated by a prudent person."

■ As argued by appellant's attorney in his able and well-reasoned brief,[3] "when the accident occurred only a few minutes had elapsed since plaintiff's arrival at the outpatient clinic. Even if his physical condition had been such as to cause the accident, which was not shown, the clinic's employees did not have sufficient time to learn of such condition and be able to foresee such possible consequences. Should we concede, only for the sake of argument, that the accident occurred in the manner described by plaintiff, namely, that he was placed on the stretcher and fell asleep and that he fell to the floor when he turned over, we would necessarily have to conclude that such standard of conduct did not come within those duties of vigilance, protection and care necessarily due him by the clinic's employees. To watch over an adult patient who is asleep, who is resting comfortably, does not come within the ambit of those 'administrative or ministerial' duties which may be classed as routine and which include the usual care, protection and hospitalization of the patient contemplated by the doctrine announced in *Hernández, supra.*

"And we can not but insist that the entire evidence of this case shows that the accident occurred so suddenly that its occurrence could not be foreseen."

In *Roth* v. *Havens, Inc.*, 353 P.2d 159 (Wash. 1960), a mental patient fell from her bed and injured herself while the nurse momentarily left her room in defendant hospital without raising the bed rails. The evidence was that, while the nurse administered to respondent on the morning in question, she appeared normal and coherent. Bed rails were required to be raised after each electric shock treatment when the patient would be temporarily confused, incoherent and unsteady. Under such circumstances, the Supreme Court of the State of Washington, citing from the case of *Cochran* v.

---

[3] For this reason we cite at length from the brief. Unfortunately it is not often that we are so fully enlightened as is done in this case.

*Harrison Memorial Hospital*, 254 P.2d 752 (Wash. 1953), said:

". . . hospitals owe to their patients such ordinary care and attention as the mental and physical condition of such patient reasonably requires. The law demands reasonable care, such care as a reasonable man would take under the circumstances existing, but no man is required to take measures against a danger which the circumstances as known to him do not suggest as likely to happen."

The court further said:

"Respondent contends the fact that the nurse momentarily left respondent alone on the bed with the bed rails down constituted a breach of the duty of care owed the respondent. Such itself is not proof of negligence. There must be proof that respondent was in such a condition, which was known or should have been known by the nurse, that reasonable care under the circumstances required raised bed rails.

"There was no such proof . . . .

". . . As a consequence, the other allegations of negligence which allegedly resulted in the nurse leaving respondent momentarily with the bed rails down, must also fail."

In *McPartland* v. *State*, 98 N.Y.S.2d 665 (1950), an epileptic patient confined in a state hospital, while convalescing and several weeks since he had an epileptic seizure, drowned in a tub for watering cattle on the other side of a fence consisting of three wire strands which separated it from the cottage where the patient lived. There was evidence that he had an epileptic seizure which caused him to fall with the upper half of the body in the tub. In affirming the judgment of dismissal, the court said:

". . . To say the epileptic patient might at long intervals be expected to fall is not to say that all that happened here was to be predicated at the risk of liability. Our judgment is that a reasonably prudent hospital management would not have anticipated what happened and should not be expected to have anticipated it at the risk of liability for the occurrence."

Again we cite from appellant's brief:

"That the accident occurred suddenly and unexpectedly is clearly demonstrated by the following statements of defendant's witness Santa Rivera. Pages 48 and 50 of the transcript of the evidence.

*Page 48:*

'Q. Could you inform the court what your intervention with this man consisted of?

'A. Well, they brought him to me on a stretcher. I was getting him ready when all of a sudden something went wrong with him, he turned over and fell to the floor.

*Page 50:*

'Q. How did the fall occur, if you know?

'A. I don't know, all of a sudden the man, you know, raised his feet, turned over and fell right away. Since the stretcher is narrow, he fell to the floor.

'Q. Did that happen suddenly or gradually?

'A. Suddenly.'

"That the accident occurred suddenly and unexpectedly was also confirmed by Dr. Benliza's testimony:

*Page 68:*

'Q. Could you tell us what the intervention consisted of?

'A. Well . . . and when I arrived he was still on the floor having chronic convulsions . . .'

*Page 69:*

'Q. What was the injection for?

'A. Since he was having convulsions it was necessary to stop them.

'Q. What type of convulsions and seizures?

'A. Type of (*sic*).

'Q. Does that occur suddenly or gradually?

'A. It comes suddenly.

*Page 70:*

'Q. Doctor, these symptoms of convulsions which you noticed in this plaintiff, are they typical of epilepsy?

'A. No, I've said that they are epileptiform, that they resemble an epileptic attack.'

"We therefore have it that while nurse Santa Rivera was getting him ready, plaintiff had a sudden epileptiform attack as a result of which he started to move suddenly, and we also

have it that this type of behavior could neither be anticipated by the nurse who was assisting him that moment since, as we have already said, the attack came unexpectedly without any previous signs that it could occur.

"In view of such clear facts, the trial court had no basis to conclude that defendant's employees were under duty to keep continuous vigilance over plaintiff's person. Nothing in the evidence shows that those employees had the least suspicion that plaintiff would be seized by such an attack."

SECOND ERROR: "The trial court erred in concluding, as a matter of law, that the physicians who attended plaintiff in the municipal hospital did not administer proper treatment."

Appellant contends, correctly in our opinion, that:

"In the course of the discussion of its conclusions of law, the trial court stated as follows:

'. . . But there is more, the patient remained five (5) days in the municipal hospital and he was not administered any treatment for the black-and-blue and fractured knee, and that with proper medical treatment and due diligence the patient would not have experienced such severe and distressing pains.' Page 6, *Statement of the Case, Findings of Fact and Conclusions of Law.*

"The only disclosure in the record on which the trial court could perhaps base the preceding conclusion is some indicia in the evidence which are wholly insufficient. Such indicia appear from the testimony of plaintiff himself who testified that during his confinement in the municipal hospital the only treatment administered consisted in staying in bed, rest and food, and that they were going to operate on him the sixth day, but that he was then removed to San Patricio Hospital.

"There was no evidence that such type of treatment was not the proper treatment for this particular case and that it was not the one used by other physicians of the community for that type of case. In considering plaintiff's testimony, the trial court became its own expert in order to judge and determine the adequate treatment for the injury to plaintiff's knee, and to conclude that the treatment administered by the attending physicians was not the proper treatment for the case."

The trial court erred in making such a determination. *Carbone* v. *Warburton*, 91 A.2d 518 (N.J. 1952), *aff'd*, 94 A.2d 680 (1953); *Crovella* v. *Cochrane*, 102 So.2d 307 (Fla. 1958).

██ Appellant contends that "It is a well-established doctrine in our law that in the absence of evidence to the contrary, the presumption is that professionals have exercised a degree of reasonable care and that the treatment administered to the patient was adequate. *Rivera* v. *Dunscombe*, 73 P.R.R. 764 (1952); *Sáez* v. *Municipality*, 84 P.R.R. 515 (1962). Plaintiff was therefore bound to overcome this presumption, and in order to do so the evidence should have established that there was something more than a mere possibility that the damage was due to the physician's failure to do his duty."

In *Sáez, supra*, we said:

". . . As stated above, an action to exact professional liability is not different from an ordinary case of damages for negligence. It is only necessary that the plaintiff establish by a preponderance of the evidence, believed by the trier, that the resulting damage was caused by acts of negligence, lack of care or skill of the physician. There is a presumption, *in the absence of evidence to the contrary*, that a degree of reasonable care has been exercised and that the adequate treatment was administered to the patient. The plaintiff is bound to present sufficient evidence to controvert this presumption, and to that end the evidence should show that there is more than a mere *possibility* that the damage was due to the physician's failure to do his duty. It is necessary that the relation of causation should not be the product of mere speculation or conjecture, *Johnson* v. *Ely*, 205 S.W.2d 759 (Tenn. 1947); *Lanier* v. *Trammell*, 180 S.W.2d 818, 824 (Ark. 1944), but a preponderance of the evidence, *Demchuk* v. *Bralow*, 170 A.2d 868 (Pa. 1961); *Atkins* v. *Humes*, 107 So.2d 253 (Fla. 1958); *Soest* v. *Balsinger*, 141 P.2d 13 (Cal. 1943); *Sansom* v. *Roos-Loos Medical Group*, 134 P.2d 927 (Cal. 1943); *Lohr* v. *Watson*, 2 N.W.2d 6, 8 (S.D. 1942), namely, that it was more probable that the harm resulted from the negligence imputed by the plaintiff. *Crewse* v. *Munroe*, 355 P.2d 637 (Ore. 1960); *Thompson* v. *Lillehei*, 164 F.Supp. 716 (Minn.

1958) ; *cf. Steele* v. *Woods,* 327 S.W.2d 187 (Mo. 1959). He can not be required in this respect to exclude every other possible causation of the damage. *Christie* v. *Callahan,* 124 F.2d 825, 840 (C.C.A. D.C. 1941); *Barham* v. *Widing,* 291 Pac. 173, 177 (Cal. 1930) ; *Boles* v. *Hotel Maytag Co.,* 253 N.W. 515, 517 (Iowa 1934). If the evidence discloses more than one possible cause of the damage, the physician can not be adjudged liable unless the evidence as a whole shows that the negligent act for which he is responsible is the more probable. *Ritter* v. *Sivils,* 293 P.2d 211 (Ore. 1956); *Heinlich* v. *Harvey,* 39 N.W.2d 394 (Wis. 1949) ; *Woronka* v. *Sewall,* 69 N.E.2d 581 (Mass. 1946); *Anderson* v. *Nixon,* 139 P.2d 216, 220 (Utah 1943). See Annot., *Proximate cause in malpractice cases,* 13 A.L.R.2d 11 (1950)."

■ We are conscious of the regrettable reluctance that generally prevails among the medical class to testify in cases such as this. However, the evidence fails to show that appellee even made attempts to obtain and present evidence that the five-day wait in the hospital and the decision that he would be operated on the sixth day, as he was actually operated on in another hospital, constituted lack of care, a case of malpractice for negligence of the hospital physicians.[4]

---

[4] *Cf. Robinson* v. *Wirts,* 127 A.2d 706 (Pa. 1956) ; *Modrzynski* v. *Lust,* 88 N.E.2d 76 (Ohio 1949); 82 A.L.R.2d 1257; 57 A.L.R.2d 379; 141 A.L.R. 5, supplemented in 81 A.L.R.2d 597; Louisell and Williams, Trial of Medical Malpractice Cases 436, par. 14.06 (1960) ; R. B. H. Gradwohl, Legal Medicine 114 (1954); Harper and James, The Law of Torts 968, par. 17.1.

The courts have dispensed with the requisite of presenting expert testimony only in those cases in which the layman's common sense indicates that the damage would not be caused if someone had not been negligent, and where the physician's good judgment in deciding on the form and manner of treating the patient does not come into play.

The following are examples of cases in which the courts have dispensed with the presentation of expert testimony:

When the question involved was:

1) object left inside the body: needle left in the abdomen, *Hohenthal* v. *Smith,* 114 F.2d 494 (D.C. Cir. 1940); sponge left in the abdomen, *Ales* v. *Ryan,* 64 P.2d 409 (Cal. 1937); *Armstrong* v. *Wallace,* 47 P.2d 740 (Cal. 1935); *Funk* v. *Bonham,* 183 N.E. 312 (Ind. 1932).

2) damage to a part of the body which was within the area treated but which was in good condition; also on damages

We agree with appellant that ". . . the fact that the operation on plaintiff's knee was not scheduled to be performed prior to the sixth day after the occurrence of the

caused to parts of the body which were distant from the area where the treatment in question was administered, *James v. Spear*, 338 P.2d 22 (Cal. 1959); removal of uvula during tonsillectomy, *Thomsen v. Burgeson*, 79 P.2d 136 (Cal. 1938); breakage of tooth during tonsillectomy, *Brown v. Shortlidge*, 277 Pac. 134 (Cal. 1929).

3) removal of an unaffected part of the body instead of the part to be actually removed, *Thomsen v. Burgeson, supra; Griffin v. Norman*, 192 N.Y.S. 322 (1922).

4) teeth lodged in patient's trachea, *Meyer v. St. Paul-Mercury Indemnity Co.*, 61 So.2d 901, *aff'd*, 73 So.2d 781 (La. 1953); *Whetstine v. Moravec*, 291 N.W. 424 (Iowa 1940); *Nelson v. Painless Parker*, 104 Cal. App. 770 (1930).

5) burns by (a) hot water bags, (b) diathermy, (c) heat lamps, (d) X rays, particularly when they are used for diagnostic purposes, (e) vaporizers, (f) chemical agents, (g) lamps (bedside), *Bessinger v. De Loach*, 94 S.E.2d 3 (S.C. 1956); *Emrie v. Tice*, 258 P.2d 332 (Kan. 1953); *Dodson v. Pohle*, 239 P.2d 591 (Ariz. 1952); *Blackman v. Zeligs*, 103 N.E.2d 13 (Ohio 1951); *West Coast Hospital Ass'n v. Webb*, 52 So.2d 803 (Fla. 1951); *Crowe v. McBride*, 153 P.2d 727 (Cal. 1944); *Trindel v. Wheeler*, 143 P.2d 932 (Cal. 1943); *Dillon v. Rockaway Beach Hospital*, 30 N.E.2d 373 (N.Y. 1940); *McCullough v. Langer*, 73 P.2d 649 (Cal. 1937); *Timbrell v. Suburban Hospital*, 47 P.2d 737 (Cal. 1935); *Vonault v. O'Rourke*, 33 P.2d 535 (Mont. 1934); *Quillen v. Skaggs*, 25 S.W.2d 33 (Ky. 1930); *Moore v. Steen*, 283 Pac. 833 (Cal. 1929); *Meyer v. McNutt Hospital*, 159 Pac. 436 (Cal. 1916).

6) infection resulting from unsterilized instruments, *Mastro v. Kennedy*, 134 P.2d 865 (Cal. 1943); *Barham v. Widing*, 291 Pac. 173 (Cal. 1930).

7) failure to take X rays to discover possible fractures, *Reynolds v. Struble*, 18 P.2d 690 (Cal. 1933).

8) a fracture so inadequately treated or cured that any person would notice it, *Olson v. Weitz*, 221 P.2d 537 (Wash. 1950).

9) incapacity resulting from drugs administered to the body, *Wolfsmith v. Marsh*, 337 P.2d 70 (Cal. 1959); *Toy v. Rickert*, 146 A.2d 510 (N.J. 1958); *Bauer v. Otis*, 284 P.2d 133 (Cal. 1955).

10) explosion of anaesthetic gases, *Dierman v. Providence Hospital*, 188 P.2d 12 (Cal. 1948).

See, however, *Sáez v. Municipality, supra.*

accident led the court to conclude that the treatment administered was not the proper treatment. However, the fact alone that during that period plaintiff experienced annoyances and pains does not point to an inference of negligence. Such action of the trial court has the effect of overcoming, with plaintiff's testimony alone on the fact that they kept him five days in bed and that they were going to operate on him the sixth day, the presumption that the attending physicians used their better judgment in electing the type of treatment and the manner of applying it. How do we know that he could be operated on before the sixth day? In what condition was plaintiff's leg and his general health during that period? Only by the medical testimony to that effect could the trial court be in a position to conclude that proper treatment was not administered to plaintiff."

For the reasons stated, we conclude that the second error assigned was committed.

In view of the preceding conclusions, we need not discuss the third error assigned to the effect that the trial court gave full credit to appellee's evidence and disregarded appellant's evidence.

For the reasons stated, the judgment will be reversed and another rendered instead dismissing the complaint in this case.

Mr. Chief Justice Negrón Fernández concurs in the result.