[Sac. No. 1769.   Department Two.—January 10, 1911.]

# CLARENCE B. KIMBALL, an Infant, by Margaret Burgess, his Guardian, Respondent, v. NORTHERN ELECTRIC COMPANY (a Corporation), Appellant.

Railroad—Employee Travelling on Pass—Business of Employer—Passenger—Trespasser.—An employee of a railroad, to whom the general superintendent of the road had referred a particular matter for investigation and report, and who in quest of information on the subject was travelling on the road on a badge entitling him to free transportation, for the purpose of interviewing a witness, acting in so travelling on the business of his employer, was a passenger and not a trespasser upon the road.

Id.—Cross-Examination of Plaintiff—Use by Others of Plaintiff's Badge.—In an action by such employee to recover damages for personal injuries while so travelling, after he had testified on cross-examination that he had allowed others in his department to use his badge during the month preceding the accident, it was not error to refuse to allow further inquiry as to who had used the badge, as such matter was immaterial.

Id.—Testing Memory—Admission of Witness.—The trial court has discretionary power to limit the scope of questions designed to test the memory of the plaintiff, and may refuse to allow questions directed to a subject-matter that is admitted by him.

Id.—Redirect Examination—Scope of Questions.—The trial court had discretion, on redirect examination, to permit a witness to answer a question that would have been proper on his direct examination, although it was not strictly redirect examination.

Id.—X-ray Protograph of Injury—Proof of Correctness—Experts.—X-ray photographs of the injured portion of the plaintiff's body, like any other chart, are admissible for illustrative purposes, and if they are admitted without strict proof of their correctness, and without proof that the medical witnesses who testified with reference to them were experts in such kind of photography, the error is harmless, where it is apparent that the condition shown by the photographs did not differ from the circumstances disclosed by the testimony of the physicians based upon their own observation.

Id.—Nurse may Testify to Extent of Suffering.—In an action to recover for personal injuries, evidence of a nurse who tended the plaintiff, as to the extent of his suffering, is admissible, notwithstanding the nurse was not an expert.

Id.—Measure of Damages—Services of Nurse—Relationship to Plaintiff.—In such action, the plaintiff is entitled to recover for

CLIX Cal.—15

the reasonable value of the services of a nurse who cared for him at her home, and the fact that such nurse was his mother, with whom he was not living at the time, raises no presumption of his non-liability for payment for her services.

ID.—AMOUNT OF JUDGMENT NOT EXCESSIVE.—A judgment for forty-one hundred dollars, for a permanent injury to the knee of a man of nineteen years of age, under the circumstances disclosed by the evidence, is not excessive.

ID.—EVIDENCE OF PHYSICIAN—ELIGIBILITY FOR ARMY—COMMON KNOWLEDGE.—Testimony of a physician to the effect that the injury to the plaintiff was sufficient to cause his rejection as a recruit in the United States army, is without prejudice, it being a matter of common knowledge that an injury such as was shown the plaintiff had sustained would have that result.

APPEAL from a judgment of the Superior Court of Sutter County and from an order refusing a new trial. K. S. Mahon, Judge.

The facts are stated in the opinion of the court.

Charles W. Slack, A. M. Seymour, and W. H. Carlin, for Appellant.

M. E. Sanborn, for Respondent.

MELVIN, J.—This is an action for damages for injuries received in a collision between two of defendant's trains. The court, sitting without a jury, gave judgment in favor of plaintiff for forty-one hundred dollars and costs of suit. From this judgment and from an order denying defendant's motion for a new trial defendant appeals.

The appellant corporation was operating an electric line between Sacramento and Chico. The cars were moved generally by an electric current introduced through a third rail, but in cities and villages the "trolley system" was used. The "trolley zone" through the village of Live Oak in Sutter County was about 2,000 feet in length. On the morning of the accident, respondent was riding in one of appellant's passenger trains which approached this "trolley zone" and passed into it from the "third rail zone." The train was moving across this space through the village of Live Oak by the momentum gained before leaving the "third rail zone" and no attempt was made to connect the trolley with the overhead wire. There

were no lights on the train owing to the fact that the trolley was not connected, because on defendant's cars the same current of electricity which moves them also furnishes illumination. In the gloom of the early morning the passenger train met and collided with a freight train which was also in darkness. Both were wrecked and plaintiff received injuries which were the basis of this action.

Appellant's first contention is that the weight of evidence is against the findings of fact made in favor of plaintiff and that said findings ought to have been made in favor of defendant. To this we must give the usual answer that the weight of evidence was for the trial court to determine. We see no reason in this case to overturn the conclusion of the court in this regard, as there was evidence to sustain the findings.

Respondent was employed by the appellant corporation as chief clerk of its purchasing department, with headquarters at Chico, and as his duties frequently required him to travel from place to place on the road, he was furnished with an "employee badge," which entitled him to free transportation over the defendant's lines.

This, of course, was to be used by respondent for business purposes, and the principal controversy in the case was upon the question whether or not Kimball was travelling on the company's business when he was injured. The trial court, in a written opinion upon this subject, made the following analysis of the matter, which we think was fully justified by the evidence:

"Some time before the first of November, 1907, some one in Yuba City had wrongfully taken possession of some cars of defendant here and used them for a different purpose than that intended. There seems to have been some feeling about the matter in Chico among the employees of defendant there. The matter became the question of much correspondence and consultation among the parties interested. It appears that one Ray Jones in Marysville, an employee of the company, was blamed, and to shield himself had placed the responsibility upon one Clive Kelly, another employee of the company at Marysville and Yuba City. The matter finally reached the office of the general superintendent, Mr. Dimmock. It is not denied that on the 1st day of November, 1907, Mr. Dimmock ordered Mr. Kimball to find out about the matter and report

to him. He did not order the purchasing department or the store department to ascertain the facts, but he ordered Kimball to find out and report to him. It isn't denied that Kelly, who wanted to continue in the employment of the company and was desirous of exculpating himself from blame, telephoned to Kimball to come down to Yuba City to hear his side of the story on this very day.

"It isn't denied that Kimball came to Yuba City, where Kelly resided, on that evening, and that Kelly went to Kimball's house and discussed the matter with Kimball on the evening of November 1st.

"Kelly said this meeting was pursuant to agreement made over the 'phone that day between him and Kimball.

"Van Arsdale was present and heard part of the conversation.

"It might be that Kimball could have attended to this business by letter or by the use of the 'phone or in some other way than by coming to Yuba City. But he chose to come to Yuba City to talk to Kelly about it and also about some other matters appertaining to the business of the company. The badge was given Kimball to use on just such occasions. Unquestionably Dimmock, the general superintendent of the road, had a right to refer this matter to Kimball to attend to instead of referring it to the department in which he worked, or to the store department. The fact that Dimmock ordered him to ascertain the facts in that case, and that on the same day he arranged to meet one of the parties who knew all about those facts pursuant to a request made by that very party, and that they did so meet and talk over that transaction, coupled with the testimony of Kimball that he came here for that purpose, conclusively proves to my mind that he came here to transact the business of the company, and that at the time he met with the accident he was travelling on the business of the company and was a passenger and not a trespasser upon defendant's cars."

During his cross-examination plaintiff testified that he allowed others in his department to use the badge during October, 1907. To the further question "Who used the badge" an objection was sustained, and this is assigned as error. We see no vice in this ruling. The question was not material. The important fact to be ascertained was not the use made of

the badge by other persons, but respondent's own use of it.

Appellant also complains that although he was permitted to examine the respondent concerning the use of the badge in October, 1907, he was not allowed to ask questions upon the same subject covering the month of September. If such questions were to test his memory, the court could very properly limit their scope. If they were asked for the purpose of showing the plaintiff's habit of using the pass when not on the company's business, no injury was wrought by the court's refusal to allow the questions, because Kimball readily admitted that such had been his practice.

During his cross-examination Mr. Kimball used a memorandum partly in his own handwriting and partly written by some one else. The cross-examiner sought to introduce this paper in evidence. This the court refused to allow, and of this ruling appellant complains. It is unnecessary to pass upon this question, as appellant's counsel waived any exception which he might have had in the premises. The court said: "I will refuse to give you the custody of the paper, but if you want the memoranda, that is the contents of the memoranda, I have no objection to that being read." To this counsel replied: "That is all we want. Let the reporter simply incorporate it in his notes." And, accordingly, the contents of the paper were read into the record.

Nor was there any error in allowing plaintiff's medical witness, Dr. Peery, to answer the question on redirect examination, "To what extent, if any, do you judge his injury will interfere with his running or jumping?" While not, perhaps, strictly redirect examination, it was the sort of question proper for direct examination, and it was therefore competent for the court, in the exercise of a sound discretion, to permit it on redirect examination.

Certain X-ray photographs of the plaintiff's knee were introduced in evidence after two of the medical witnesses had been examined with reference to them. Numerous objections were offered to questions propounded to these witnesses and many exceptions were taken by appellant. It is insisted by appellant that these objections should have been sustained, and that we are bound to reverse the judgment for such errors. Counsel for appellant contend that the proponents of the photographs failed to introduce proof of their correctness or that either of

the doctors was an expert in such matters. While, perhaps, the examination was not minute upon this subject as one might wish, it does sufficiently appear that Dr. Peery, Dr. Barr, and others were present at Dr. Wallace Briggs's office in Sacramento when X-ray plates were made of plaintiff's knee, and that the photographs introduced in evidence were printed from these plates. While it would have been better, no doubt, to have introduced evidence of the familiarity of the physicians with the process of X-ray photography and the methods employed in preparing these particular exhibits, we cannot see that the omission so to do amounted to error necessitating the reversal of the cause. The witnesses were qualified surgeons. It is well known that the X-ray is almost universally understood and used by surgeons of the present day in examining injuries. Doubtless the court required less preliminary proof from such witnesses than would have been exacted from laymen. The surgeons had testified without objection that they had examined the injuries themselves by the use of the X-ray apparatus, and this testimony in itself was an indication that they were familiar with the uses of the Roentgen rays. When, therefore, they testified to the taking of certain X-ray pictures, or rather the making of plates, the court doubtless assumed that the ordinary methods of those familiar with such matters had been followed. While counsel for appellant objected to the testimony of the surgeons upon the ground of the failure of respondent to show their expert qualifications, no request was made of the court that these gentlemen should be preliminarily questioned upon that subject. The surgeons put initials on the plates at the time they were made, and testified that these initials appeared on the prints introduced in evidence. But even if an error were committed in the admission of testimony relating to the photographs, it was harmless, for it is evident that the condition shown by the photographs did not differ from the circumstances disclosed by the testimony of the physicians based upon their observations. A photograph is used like any other chart, for illustrative purposes (see *People* v. *Loper*, (Cal.) 112 Pac. 720; *People* v. *Durrant*, 116 Cal. 213, [48 Pac. 75]; *People* v. *Crandall*, 125 Cal. 133, [57 Pac. 785]; *People* v. *Mahatch*, 148 Cal. 203, [82 Pac. 779],) and where, as in this case, such illustrations do not mislead, no error is wrought.

The admission of testimony of respondent's nurse upon the extent of his suffering was not erroneous. Such testimony is competent and does not require expert qualifications in the person giving it. In *Kline* v. *Santa Barbara etc. Ry. Co.,* 150 Cal. 750, [90 Pac. 129], the following language was used: "It does not require an expert to tell whether a person .suffers. The appearance of a person who suffers severely is sufficient to manifest his condition to any one of ordinary intelligence and experience. These witnesses had all observed her, had heard her groans and complaints, and were competent to give an opinion as to her suffering." This so clearly answers appellant's objection that further comment is unnecessary.

Appellant complains of certain rulings admitting evidence of the use by another of the railroad company's employees of Kimball's pass, on the ground that such evidence was not given in rebuttal, no estoppel having been pleaded authorizing a showing of appellant's general custom of allowing its servants to travel on passes when not on business for the corporation. It is not necessary to consider whether or not this was error, as the court based its judgment, not on the permission given Kimball to use the pass when off duty, but upon a finding that he was actually in the .performance of his work and was acting under the orders of his superior when the accident occurred. We have carefully examined the objections of appellant to the amount of damages. The court allowed Mrs. Burgess ninety dollars for her services in caring for the respondent at her home in Yuba City. Appellant's contention is that there is no evidence that Kimball had obligated himself to pay for such services. True, she was Kimball's mother, but she was a nurse of sixteen years' experience and her services, as she described them in her uncontradicted testimony, were certainly worth the amount awarded. The respondent had not been living at her home, and the mere fact of their relationship does not remove the presumption that he was bound by the acceptance of her services to pay a reasonable value for them. In discussing the extent of damage to Kimball's knee the learned judge who tried the case said: "The weight of the testimony is that he has met with a permanent injury. That he can never run or jump, take long walks, or carry heavy burdens, or dance, that it will always be susceptible to injury, and that he will always have to favor it, is the

testimony of disinterested experts. What amount of money will compensate a young man in his nineteenth year for such an injury and such a future? His occupation in life can scarcely be said to be settled at this age. By reason of such an injury many avenues to success are closed to him. It is possible that he may be able to choose one of a sedentary character in which he can succeed. But much of the spice of life, enjoyments that only come from the full use of both knees, are to him a memory. This injury befell him at the very worst period in his life, just after he had finished school and was thinking of life's career. I don't know what his plans were for life, but I do know that it was not impossible that this injury should have changed them all. There are many things that he could have chosen before that he can't choose now. Even though his knee should in time get well, the opportunities that are now open will not be available to him then. To await his complete restoration to usefulness, in the face of the testimony of the physicians, would be unwise. It isn't to be wondered at that the contemplation of these things has made him nervous and restless, and given him much mental pain and anxiety." This is a most excellent summing up of the evidence and its effect, and we cannot say that four thousand dollars, in view of all the circumstances, must be regarded as an excessive amount in compensation for the injury sustained by respondent.

One of the questions propounded to Dr. Barr was this: "Conceding plaintiff sound in every respect except as to his right knee, could he successfully pass an examination for admission to the army?" Over the objection that the question was incompetent, irrelevant, and immaterial and not a matter of expert testimony, the witness answered: "Were I examining him for the United States army, I would have to reject him on account of the condition of that knee." While we think Kimball's eligibility for the army was a proper matter of expert testimony, as showing that one vocation was closed to him (and Doctor Barr was qualified as an expert on the examination of young men for the army of the United States), it is not necessary to consider the objection made by appellant, because the answer as given was in nowise responsive to the question. The evident purpose of the examiner was to learn whether or not the respondent was physically sound with the exception of

the injured knee—as sound as an accepted recruit in the army. The answer merely told the judge of something which he must have known before if he credited the doctor's testimony, —namely, that the injury was sufficient to exclude the young man from the army, because it is generally known that such a defect as a permanently injured knee would have that result. We cannot see how appellant could have been injured by the answer because it revealed in no manner the respondent's physical perfection or lack of it in parts of his body other than his knee, and did not indicate whether or not he would have been a good subject for admission to the army before the accident.

We find no other alleged errors requiring especial attention. It follows therefore that the judgment and order must be affirmed.

Henshaw, J., and Lorigan, J., concurred.