[Civ. No. 8843. First Appellate District, Division One.—May 16, 1935.]

SALLY SIM, a Minor, etc., Respondent, v. ALANSON WEEKS, Appellant.

Hartley F. Peart, Redman, Alexander & Bacon and Herbert Chamberlin for Appellant.

M. Mitchell Bourquin for Respondent.

GRAY, J., *pro tem.*—Respondent Sally Sim, aged six years, broke her left arm, just above the elbow, while playing with other children at a home where her parents were visiting friends. Her parents promptly rushed her to the nearest hospital where the appellant, Dr. Alanson Weeks, as a physician and surgeon, treated her injury. He correctly diagnosed this injury as a supracondylar fracture of the lower end of the humerus of the left arm. Following his diagnosis, he first manipulated the arm to bring the displaced bones into normal position and then put up the arm with the elbow-joint acutely flexed and with the supinated forearm bandaged to the upper arm by two-inch adhesive tape, and fastened to the chest in a sling of such tape. His services then ended and the child was taken home. During the night the arm swelled, causing pain, which made the child restless. The next morning, the parents being alarmed by the continued swelling of the arm and the pain suffered by the child, consulted the defendant Dr. Edward Salomon, also a physician and surgeon, and, at his suggestion, immediately had X-ray pictures of the arm taken. That afternoon Dr. Salomon examined the arm and the X-rays, but did nothing. Later in the afternoon appellant, after a communication from Dr. Salomon, inquired of the mother by telephone as to the child's condition, but gave no directions. That night, the arm having continued to swell, the mother, on her own volition, partially cut the bandage. The next afternoon, pursuant to Dr. Salomon's advice, she released the bandage and put the arm in a loose sling. On the third day after the injury, at Dr. Salomon's arrangement, a specialist examined the arm at another hospital and found that ischemic paralysis, caused by the impairment of the blood circulation, had developed in the arm. As a result of this paralysis, the structure and function of the arm became seriously dam-

aged. Thereupon respondent sued both doctors to recover damages for their alleged negligence. After trial, the jury returned its verdict exonerating Dr. Salomon and awarding damages against Dr. Weeks in the sum of twelve thousand five hundred dollars ($12,500). The latter appeals from the judgment entered thereon, assigning as grounds for reversal (1) the insufficiency of the evidence to establish (a) either that he was negligent, (b) or that the injury was a proximate result of his negligence, (2) erroneous admission in evidence of an enlargement of the X-ray pictures, (3) erroneous instructions and (4) excessive damages.

It is well settled that a physician and surgeon cannot be held to guarantee the results of his professional services. ''However, it is equally well settled that in undertaking a treatment of a patient the practitioner impliedly contracts and represents not only that he possesses the reasonable degree of skill and learning possessed by others of his profession in the locality, but that he will use reasonable and ordinary care and skill in the application of such knowledge to accomplish the purpose for which he is employed; and that if injury is caused by a want of such skill or care on his part he is liable for the consequences which follow. (*Houghton* v. *Dickson,* 29 Cal. App. 321 [155 Pac. 128] ; *Nelson* v. *Painless Parker,* 104 Cal. App. 770 [286 Pac. 1078] ; *Perkins* v. *Trueblood,* 180 Cal. 437 [181 Pac. 642] ; *Hesler* v. *California Hospital Co.,* 178 Cal. 764 [174 Pac. 654] ; *Ley* v. *Bishopp,* 88 Cal. App. 313 [263 Pac. 369] ; *Patterson* v. *Marcus,* 203 Cal. 550 [265 Pac. 222].) Furthermore it is held that actionable negligence in cases of this kind consists in doing something which the practitioner should not have done or in omitting to do something which he should have done, and that what is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts and can be established only by their testimony. (*Perkins* v. *Trueblood, supra.*)'' (*Roberts* v. *Parker,* 121 Cal. App. 264, 267 [8 Pac. (2d) 908].)

There was no issue as to appellant's diagnosis or reduction of the fracture. Respondent made no claim that appellant did not possess the requisite skill and learning, but her sole contention was that he was negligent in the application of that skill and learning to the treatment of her injury. All the medical experts agreed that the usual and proper treatment for such a fracture was to put up the arm with the

elbow-joint flexed, the supinated forearm being fixed to the upper arm, fastened to the chest in a sling and that, on account of the danger of ischemic paralysis, it was improper to bandage too tightly or to flex the elbow-joint too much. They were also in accord that in determining the extent of the flexion and the tightness of the bandage, due allowance must be given to the swelling of the arm, normally following such an injury. Respondent asserted and appellant denied that he was negligent in flexing the arm so acutely and in bandaging it so tightly as to impair the circulation. To establish that the treatment in this regard was not usual or proper, when measured by the requisite standard, and hence negligent, under the foregoing rule, respondent introduced the testimony of but one medical expert, which was based on a study of the X-rays and an examination of respondent, preparatory to testifying, and was given in response to hypothetical questions. Appellant's claim that the evidence is insufficient to establish his negligence consists of an argument that such expert's testimony is insufficient for that purpose, not in its entirety but in certain vital particulars. Hence it will be necessary to review only such of his testimony as is criticised.

Much of the force of the argument is derived from over emphasis of isolated portions of his testimony and by consideration of an answer detached from its question. For instance, in reply to a question as to whether the position of the arm as shown by the X-rays was recognized as proper by physicians and surgeons in San Francisco for the placement of an arm in reduction, he answered that it was not the proper position. Likewise, when asked whether the bandaging as described in a hypothetical question was recognized by physicians and surgeons in San Francisco as proper for the reduction of such fracture, he responded that it was not the proper way. Appellant argues therefrom that the witness was stating his personal opinion as to the propriety of the treatment rather than as to the standard of care exercised by the average physician and surgeon of ordinary skill in his locality. If the adjective "proper" is not over stressed and the verb "was recognized" is not eliminated, as appellant impliedly does, it is obvious that the witness was speaking of what physicians and surgeons recognize as proper. Again as to other questions and answers worded substantially as the above, appellant argues that they are wholly inadequate to

justify a conclusion that appellant's treatment did not satisfy the standards of care exercised by the average physician and surgeon of ordinary skill in this locality, since proper treatment implies that no error shall be committed in the treatment. As appellant contends, the law does not require that his treatment should have been at all events and beyond question proper, but it does require that he should have used the degree of skill and care ordinarily possessed and exercised by members of his profession in good standing, practicing in the same or similar locality. (*Hesler* v. *California Hospital Co., supra; Markart* v. *Zeimer,* 67 Cal. App. 363 [227 Pac. 683].) Since the record discloses that both counsel used the shorter, criticised phrase in lieu of the fuller, legal definition of the required standard of care, appellant cannot now complain. (*Reynolds* v. *Struble,* 128 Cal. App. 716 [18 Pac. (2d) 690].) In absence of a timely objection, which would have advised respondent as to the necessity of using the full legal definition in her question, appellant cannot now question the sufficiency of the testimony. (*Howland* v. *Oakland C. St. Ry. Co.,* 110 Cal. 513 [42 Pac. 983] ; *Spear* v. *United Railroads,* 16 Cal. App. 637 [117 Pac. 956].)

Assuming the correctness of appellant's contention, the inadequacy of this testimony is not vital, since its deficiency is satisfied by other evidence, as stated in respondent's brief. (*Rankin* v. *Mills,* 207 Cal. 438 [278 Pac. 1044].)

Respondent's sole medical expert interpreted the X-rays as showing that the elbow-joint had been flexed as far as it could possibly go under pressure; that the forearm had been placed against the upper arm as close as it would go without being heavily forced and that the bandage was too tight. Two roentgenologists, on appellant's behalf, read the X-rays as showing a degree of flexion, usually used in this type of reduction, and no undue pressure from the bandages. One of these specialists interpreted the degree of flexion to be 45 degrees, but did not, as appellant claims, give this as an actual measurement. Therefore, there is no basis in fact for appellant's argument that the interpretation of respondent's expert, based on an estimated greater degree of flexion, must fall in face of an actual measurement of a lesser degree of flexion. As a physician and surgeon, respondent's expert was competent to read the X-rays. (See, cases collected in 77 A. L. R. 946, 955.) The relative weight

to be given to his interpretation as compared to those of the roentgenologists, with claimed greater training and experience, was a matter confided in the jury.

In his deposition, as summarized by him, appellant testified in part as follows: "I manipulated the bone to bring the ends of the bone into place, and *I felt confident it was in very good position;* the manipulation consisted in pulling the lower fragment down and back in the direction in which it had gone when it was broken and then tipping it over the lower end of the upper fragment and turning the arm up into a flexed position, and *at all times I had it the way I thought best;* . . . I did not flex the child's arm as far as it would go, *but I had it up as far as I thought necessary to keep the bone in position;* it was short of full flexion, short of too much pressure on the soft tissue so that the hand could have been moved toward the shoulder three inches more; it could have been pushed up three inches more, but the child couldn't move it; no force was necessary to accomplish this flexion; . . . adhesive strap was used in the form of a sling in which the forearm hung; it in no way went around either the forearm or the upper arm, and it went around one side of the forearm and around behind the upper arm; it was slung from the wrist, beginning at the hand and continuing two inches and no more toward the elbow; and opposite that on the upper arm was where the bandage went around, just as a sling." (Italics ours.) Similar, but not as favorably worded, testimony was given by him at the trial. ▮ Appellant argues that since he was called upon to exercise and did exercise his best judgment as to the method to be adopted in bandaging the arm so that the broken bones would not again become displaced, he is not chargeable with any error, resulting in injury. But the present charge is not that he was negligent in his choice of method but that he was negligent in the performance of the chosen method. While a physician cannot be held liable for mere errors of judgment or for erroneous conclusions on matters of opinion, he must use the judgment and form the opinions of one possessed of knowledge and skill common to medical men, practicing in the same or like community and that he may have done his best is no answer to an action of this sort. (*Reynolds* v. *Struble, supra.*) "It has been broadly held that a physician or surgeon is not liable for an honest error or mistake in judgment.

However, a limitation of this broad rule is recognized in cases that exempt from liability for errors of judgment only where there is a reasonable doubt . . . as to the proper course to be followed, or where good judgments may differ. Another limitation of the broad rule above stated is found in cases that hold a qualified physician is not liable for an error of judgment if he applies ordinary and reasonable skill and care . . . or keeps within recognized and approved methods or the common practice; . . . Thus, where there is more than one recognized and approved method of treatment applicable to the case, a physician or surgeon is not liable for an honest mistake of judgment in selecting a method. Whether errors of judgment will or will not make a physician or surgeon liable in a given case depends . . . on whether he has treated the case skilfully or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession.'' (48 C. J. 1127.) ■ A charge of negligence in a choice of treatment is refuted, as a matter of law, by showing that a respectable minority of expert physicians approved the method selected. But where a physician is charged with negligence in the actual performance of a treatment, after its method was chosen over others, evidence tending to show such negligence presents a case for the jury. (*Swanson* v. *Hood,* 99 Wash. 506 [170 Pac. 135].) A physician cannot, as a matter of law, defeat an action for malpractice by testimony that, possessing ordinary knowledge and skill, he determined on the course pursued in the exercise of his best judgment, if he did not use ordinary care. (*Kimble* v. *Roeder,* 115 Neb. 589 [214 N. W. 1].)

■ Appellant produced five medical experts, in addition to himself, each of whom, it may be conceded for present purposes, fully approved his treatment and therefore expressed opinions as to its propriety contradictory to that of respondent's sole expert. From this premise, he fallaciously argues that he is not chargeable with negligence, since the opinions of many experts support and the opinion of but one opposes his treatment. ''The adoption of this view would be to change the rule of liability so as to hold a surgeon responsible only when his acts evidence a want of skill below that of the most unskilful surgeon whom the defendant might be able to produce. The jury must judge of the skill and qualifications of the expert witnesses, as well as of the de-

fendant in the action, and it is for the jury to say, upon all the evidence, what treatment amounted to negligence, under the rule of skill required." (*Hewitt* v. *Eisenbart*, 36 Neb. 794, 800 [55 N. W. 252, 254].) The difference in the number of witnesses is a false quantity since "the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact" (Code Civ. Proc., sec. 1844), and since the jury "are not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a less number". (Code Civ. Proc., sec. 2061, subd. 2.)

As to his second assignment, appellant argues that the testimony of respondent's expert is insufficient, in four particulars, to warrant the conclusion that the ischemic paralysis was caused by the tightness of the bandages. He gives no separate consideration to the flexed position of the elbow as a cause of injury nor to the sufficiency of other evidence to establish a causal connection between the treatment and the paralysis. To concentrate undivided attention to his argument, it will be discussed on the basis propounded by him. First he asserts, without reviewing such expert's testimony, that his opinion as to the cause of the paralysis was an invasion of the province of the jury. The following excerpt from the well-reasoned case of *DeGroot* v. *Winter,* 261 Mich. 660 [247 N. W. 69], relying in part upon appellant's citation, correctly states the limitations within which an expert may give an opinion as to the causal connection between the treatment and the injury in a malpractice case. "Upon the issue of whether defendants were guilty of malpractice by commission or omission, the expert could and did give opinion evidence. Upon the ultimate issue of whether plaintiff's condition resulted solely from malpractice, the expert should not have but did give his conclusion as to a fact, not necessarily following malpractice, and in dispute. When a result may or may not be occasioned by malpractice, an expert medical witness invades the province of the jury when permitted to go beyond stating that it *could* and in saying that it *did* occasion the result. Such an opinion is but the private judgment of the witness and not competent evidence. Whether the alleged malpractice could occasion the result complained of was one of science only. Whether malpractice did occasion such result was in controversy, and

therefore not one of mere science. When the facts are admitted and not in dispute, the question, if answered, may be considered one of science. But, when a result could have been occasioned by one of two or more causes, the ultimate fact of which cause occasioned the result is for determination by the jury, and a medical expert may not, in case of conflicting evidence, invade the province of the jury and testify that the result was in fact occasioned by one cause only.'' An expert should not be permitted to express an opinion as to an ultimate fact which is to be decided by the jury. (*Shafter* v. *Evans*, 53 Cal. 32; *People* v. *Westlake*, 62 Cal. 303; *Conner* v. *Stanley*, 67 Cal. 315 [7 Pac. 723]; *Redfield* v. *Oakland C. S. Ry. Co.*, 112 Cal. 220 [43 Pac. 1117]; *Pacheco* v. *Judson Mfg. Co.*, 113 Cal. 541 [45 Pac. 833]; *Reclamation Dist. No. 537* v. *Burger*, 122 Cal. 442 [55 Pac. 156]; *People* v. *Overacker*, 15 Cal. App. 620 [115 Pac. 756]; *Giberson* v. *Fink*, 28 Cal. App. 25 [151 Pac. 371].) However, appellant has not pointed out nor has a reading of the expert's testimony disclosed any transgression of this rule.

█ Secondly, appellant claims that the opinion of respondent's expert was based upon his speculative interpretation of three radiographs, whereas actual measurements made upon the radiographs demonstrated that there was no undue pressure from the bandages. As previously stated, the so-called actual measurements amounted to no more than an interpretation by appellant's roentgenologist of the degree of flexion, which raised a conflict of which the jury were the exclusive judges. Since his opinion was not based exclusively on a reading of the X-rays, appellant's assumption of fact, even if correct, would not necessarily destroy such opinion in its entirety but, at most, would present a question of its weight and credibility for the jury's decision. █ Thirdly, appellant contends that the expert's opinion was based upon the three radiographs, one of which his roentgenologist testified was distorted. Such testimony merely presented a matter for the jury's consideration in passing upon the weight and credibility of such opinion. █ Fourthly, appellant states that respondent's expert later qualified his own opinion by admitting that ischemic paralysis might have developed pathologically and from internal pressure, and the other experts were of the opinion that pathology

and not trauma caused the ischemic paralysis. This contention is somewhat inconsistent with the first, for there he argued that respondent's expert was too positive in his opinion that there was but one cause of the injury and here admits other possible causes. The conflict between the opposing opinions raised a question, committed to the jury for decision, and its verdict thereon cannot be disturbed for lack of evidentiary support, unless it is without substantial support in the evidence. (*Walter* v. *England*, 133 Cal. App. 676 [24 Pac. (2d) 930].) "After the verdict of a jury has been fairly rendered, all the circumstances of the case, together with every reasonable inference which may be drawn therefrom, will be marshaled in support of the judgment. Because of the very subtleness of the origin and development of disease, less certainty is required in proof thereof. As the court says in the case of *Dimock* v. *Miller*, 202 Cal. 668, 671 [262 Pac. 311, 312]:

" 'If . . . it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted ·in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science.'

"It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion. It is sufficient if there is substantial evidence upon which to reasonably support the judgment. (*Ley* v. *Bishopp*, 88 Cal. App. 313, 316 [263 Pac. 369].)'" (*Barham* v. *Widing*, 210 Cal. 206, 215 [291 Pac. 173].) The nature and extent of the injury to the tissues, muscles and blood vessels of respondent's arm, received at the time of fracture, and the progressive development of injury to those parts following appellant's treatment not only support the jury's conclusion that paralysis was caused by trauma, arising from the treatment, but negative a conclusion that the paralysis developed pathologically and from internal pressure. A similar verdict as to a similar injury under similar conflicting opinions was sustained in *Van Der Bie* v. *Kools*, 264 Mich. 468 [250 N. W. 268].

Appellant next assigns as prejudicial error the admission in evidence, over his objection, of enlarged photographs of the X-rays. "While a picture produced by an

X-ray cannot be verified as a true representation of the subject in the same way that a picture made by a camera can be, the rule in regard to the use of ordinary photographs on the trial of a cause applies to photographs of the internal structure and conditions of the human body taken by aid of X-rays, and such a photograph, when verified by proof that it is a true representation (citing *Kimball* v. *Northern Electric Co.,* 159 Cal. 225 [113 Pac. 156], among others), is admissible in evidence.'' (Citing *Bruce* v. *Western Pipe etc. Co.,* 177 Cal. 25 [169 Pac. 660], among others; 22 C. J. 916; see, also, note in 77 A. L. R. 946.) ''It is no objection to the admissibility of a photograph that it is enlarged, showing the subject or object magnified, where this does not have a tendency to mislead. Photographs of instruments already in evidence which are so enlarged as to make the proportions plainer and to illustrate the testimony of the witnesses may go to the jury in the same way as would a magnifying glass or microscope.'' (22 C. J. 918.) It is for the trial court to determine from the evidence before it whether enlargements of photographs already in evidence are correct representations thereof, and its ruling will be sustained unless it is apparent that there has been an abuse of discretion. (*Diller* v. *Northern Cal. Power Co.,* 162 Cal. 531 [123 Pac. 359, Ann. Cas. 1913D, 908].) Conceding that the enlargements exaggerated and distorted the alignment of the bones, appellant was not thereby prejudiced, since there was no issue as to the reduction of the fracture. No other claim is made that the enlargements had a tendency to mislead.

 It is further urged that the jury was misled to appellant's prejudice by erroneous instructions respecting preponderance of evidence and negligence. The first criticism is based upon several statements in two instructions to the effect that the jury must decide medical matters according to the preponderance of the medical testimony. From this he argues that he was denied a verdict if his expert testimony balanced that of respondent and hence a greater burden of proof than required was imposed upon him. Other instructions correctly defining preponderance of evidence told the jury, just as he argues it should have been, that if the evidence was equally balanced on any issue the jury must find against respondent on that issue. The criticised instructions on negligence charged appellant with the duty of using the

skill and learning of a reasonably learned, skilful, careful, diligent and prudent physician and surgeon in this locality and with the duty of conforming to the prevailing standards in such locality. These instructions, he asserts, imposed upon him a higher standard of care than the law requires, since he was only required to use the skill and learning of the *average* member of his profession in good standing in the particular locality. The word "average" as used in *Say* v. *Barber*, 202 Cal. 679, 681 [262 Pac. 312], upon which he relies as authority, means the same as "reasonable" and "ordinary". (*Whitesell* v. *Hill*, (Iowa) 66 N. W. 894.) "In order to determine who will come up to the legal standard indicated, we are not permitted to aggregate into a common class the quacks, the young men who have no practice, the old ones who have dropped out of the practice, the good, and the very best, and then strike an average between them. This method would evidently place the standard too low." (*Holtzman* v. *Hoy*, 118 Ill. 534, 536 [8 N. E. 832, 59 Am. Rep. 390].) There is no merit in either criticism.

 The injured arm was the one most frequently used by respondent. The treatment aggravated the swelling normal to such fracture and created blood blisters at the wrist and elbow. For weeks, the arm was swollen and the tissues at the wrist and elbow were infected and maturated with sloughing. During this period, respondent suffered intense pain with attendant loss of sleep. She was treated by massage and physiotherapy for about six months with slight improvement. The condition of the arm at the time of trial (one and one-half years after the injury), was permanent, with no possibility of improvement by medical treatment. The muscles had wasted and hardened so that she could flex her elbow only ninety degrees, her thumb ten degrees and her fingers were powerless. Without a mechanical device, the hand contracted into a claw. The injury to the arteries had so curtailed the blood supply to the bones and tissues that the arm had practically stopped growing and was at time of trial one-half inch shorter and one-third less in circumference than the other. The withered arm with its claw-like hand, especially because of her sex, has caused her humiliation and mortification, which will increase progressively through her life. Functionally, the arm is of but little use, and for the sake of appearance, its removal probably would be an aid..

Although the lack of an exact rule of admeasurement and the difference in the evidence of each case makes a comparison of awards for similar injuries of doubtful value, it is interesting to note that in other jurisdictions, verdicts for similar injuries in amounts, larger than the present one, have been held to be not excessive. (17 C. J. 1101.) In this state the following cases have sustained the following amounts for similar injuries, to wit: *Perry* v. *Angelus Hospital Assn.*, 172 Cal. 311 [156 Pac. 449] (decided March 14, 1916), $11,500; *Scally* v. *W. T. Garratt & Co.*, 11 Cal. App. 138 [104 Pac. 325] (decided August 21, 1909), $7,500; *Griffith* v. *Oak Ridge Oil Co.*, 190 Cal. 389 [212 Pac. 913] (decided February 9, 1923), $8,363. For purpose of comparison, these amounts must be adjusted upwards to compensate for the present-day decrease in the purchasing power of the dollar. (*O'Meara* v. *Haiden*, 204 Cal. 354 [268 Pac. 334, 60 L. R. A. 1381]; *Rowe* v. *Rennick*, 112 Cal. App. 576 [297 Pac. 603].) The amount of the verdict was approved by the trial judge in denying the motion for a new trial. Considering the nature of these injuries and their permanent character, together with the suffering already caused to the respondent and the present and future humiliation and mortification endured and to be endured by her, it cannot be said that the verdict was so excessive as to warrant the conclusion that it was the result of passion, prejudice or corruption on the part of the jury. (*Perry* v. *Angelus Hospital Assn., supra; Griffith* v. *Oak Ridge Oil Co., supra.*)

The judgment is affirmed.

Cashin, J., concurred.

TYLER, P. J., Dissenting.—I dissent.

The pivotal question presented by the appeal is whether defendant's treatment of the child came up to the standard exercised by the average physician of ordinary skill in the locality. It is appellant's contention that the judgment lacks evidentiary support for the reason it was not established that the treatment of the fracture by Dr. Weeks did not satisfy the standards of care exercised by the average physician and surgeon of ordinary skill in the locality, or that Dr. Weeks did not exercise his best judgment in adopting an improvement method of treatment. As pointed out in

the main opinion it is not claimed that appellant did not possess the required skill and learning, the sole contention being that he was negligent in the application of his skill in the treatment of the injury.

Appellant, as the record shows, has a very high professional standing. He is clinical professor of surgery at the University of California and he has received the distinguished service medal for good surgery work during the World War. There is evidence to show that after the little child broke her arm she was hurried to a sanitarium about a mile away. Dr. Weeks had been visiting a patient at that institution and was just departing when the child arrived with her parents. He was asked by the attending physician at the sanitarium to render first aid or emergency treatment. This he agreed to do as an act of humanity. He set and bandaged the arm. His services began and ended with this act. He notified the mother of the danger of swelling and instructed her to notify her own doctor at once. This she did. The doctor, the next day, examined the arm and bandages but did not disturb or change the same.

All of the medical experts, five in number, in addition to appellant, testified that the treatment was proper. To prove the alleged negligence, plaintiff presented but one medical expert, a Dr. Gardner. He had never attended the child professionally but had examined her on one occasion some twenty months after the accident. His testimony was based upon hypothetical questions and an examination of the X-rays or radiographs which were taken of the injured arm the morning after the accident. His testimony was to the effect that the flexed position revealed by the radiographs was improper, and the bandaging too tight. The testimony of plaintiff's expert does not, in my opinion, establish that the treatment of the fracture did not satisfy the standard of care exercised by the average physician or surgeon of ordinary skill, nor does it show that defendant did not exercise his best judgment in adopting an improved method of treatment, nor does it establish any negligence proximately causing the injury complained of. The fact that this expert might have approved or adopted other methods does not show negligence or want of skill. Appellant was called upon to exercise his best judgment as to the method to be adopted in bandaging the arm so that the broken bones would not become displaced.

In my opinion there is no evidence to show that he did not use ordinary care in his treatment of the child. The most that plaintiff's single expert witness shows is that his judgment differed from that of appellant in the treatment of the fracture, and that he would have pursued a different method. That he might have used a different method is of no consequence. The controlling question is whether the defendant's treatment of the child satisfied the standards of care exercised by the ordinary surgeon in the community. The testimony, in my opinion, shows without conflict that it did, and this being so, the case falls within the rule laid down in *Hesler* v. *California Hospital Co.*, 178 Cal. 764 [174 Pac. 654], and *Markart* v. *Zeimer*, 67 Cal. App. 363 [227 Pac. 683].

It is my opinion that the judgment lacks evidentiary support and for that reason should be reversed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 15, 1935, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 12, 1935.