Jimmie Nathan ROSE, Appellant,

v.

D. T. FRIDDELL, M.D., Appellee.

No. 306.

Court of Civil Appeals of Texas.

Tyler.

Dec. 28, 1967.

Rehearing Denied Feb. 8, 1968.

Mitchell D. Stevens, Dallas, for appellant.

W. H. Frank Barnes, Terrell, for appellee.

MOORE, Justice.

This is a damage suit brought against Dr. D. T. Friddell, a physician of Terrell, by Jimmie Nathan Rose, for malpractice in setting a fractured arm. At the conclusion of the plaintiff's evidence, in response to defendant's motion, the court withdrew the cause from the jury and entered judgment in favor of defendant. From such ruling and judgment, plaintiff duly perfected this appeal.

The allegations of the plaintiff's petition were, in substance, as follows: that on or about May 16, 1948, when appellant was four and one-half years of age, he fell and suffered a supracondylar fracture of his left arm at a point just above the elbow. Upon receiving the injury, his parents took him to defendant, who reduced the fracture, and negligently bound the arm so tight with tape and gauze that the circulation in the arm was obstructed, which finally resulted in total paralysis of the left arm and hand; that as a direct and proximate result of defendant's negligence, plaintiff suffered what is known as a Volkmann's contracture, causing the arm to wither and fail to grow

to the same size as the right arm, resulting in a contracture to the left wrist and hand so that the same was left in a claw-like position. Plaintiff alleged that defendant failed to exercise that degree of care and skill as other doctors in the same vicinity would have used and was guilty of the following specific acts of negligence proximately causing his injuries, to-wit:

"A. The Defendant failed to made an adequate physical inspection of the Plaintiff's arm to determine the nature and extent of all underlying pathology, to wit: the jagged portions of the bone that could cause extensive damage to the vascular and nervous system in and around the said fracture.

"B. Defendant, in setting the arm, placed said arm in flexion, but should have placed the arm in extension until he could discover all of the underlying pathology.

"C. In placing the gauze and tape bandage in and around the fractured area that impeded the circulatory flow of blood and thereby causing the damage as heretofore described.

"D. In failing to take adequate remedial measures to determine whether or not the circulatory system had been damaged prior to setting the arm or after discovering that there was swelling in and around the fractured area underneath the tape and gauze bandage.

"E. In failing to loosen the tape and gauze bandage immediately after the mother brought the boy back in the next morning after the fracture had been set.

"F. In failing to call in a specialist to treat an injury of this nature especially after he had discovered that there was swelling, pain and discoloration in and around the tape and gauze bandage placed around the fractured area."

The ground, recited by the court, for withdrawing the cause from the jury and rendering judgment in favor of the defendant was "* * * the evidence failed to show that defendant was guilty of any negligence that was the proximate cause of any injury and damages sustained by plaintiff * * *."

Plaintiff predicates his appeal upon five points of error, asserting that the trial court erred in ruling that there was no evidence of probative force showing that the various acts and omissions by the defendant amounted to negligence proximately causing his injury.

■ The burden of proof in a malpractice case is upon the plaintiff, first to prove the negligence in treatment as alleged, and, second, to prove that this negligence was the proximate cause of the injury complained of. Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1; Thomas v. Beckering (Tex.Civ.App.), 391 S.W.2d 771.

■ It is well settled that a physician and surgeon cannot be held to guarantee the results of his professional services. However, it is equally well settled that in undertaking the treatment of a patient, the practitioner impliedly contracts and represents, not only that he possesses the reasonable degree of skill and learning possessed by others of his profession in the locality, but that he will use reasonable and ordinary care and skill in the application of such knowledge to accomplish the purpose for which he is employed; and that, if injury is caused by a want of such skill or care on his part, he is liable for the consequences which follow. Gifford v. Howell (Tex.Civ. App.), 119 S.W.2d 578. Furthermore, it is held that actionable negligence in cases of this kind consists in his doing something which he (the practitioner) should not have done, or in omitting to do something which he should have done; and that what is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts and can be established only by their testimony. Bowles

v. Bourdon, supra; Sim v. Weeks, 7 Cal. App.2d 28, 45 P.2d 350.

■ In determining whether the plaintiff has discharged his burden of proof with respect to negligence and proximate cause, we are required to interpret the evidence in a light most favorable to the plaintiff, disregarding all evidence and the inference therefrom favorable to defendant. Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914).

The cause of the plaintiff's Volkmann's contracture, it seems to be agreed by both defendant and plaintiff, was starvation of the muscles and nerves in the arm for lack of blood supply. To establish that defendant's treatment in this regard was not proper, when measured by the requisite standard and hence negligence, under the foregoing rule, plaintiff introduced the testimony of but one medical expert, Dr. J. L. Touchstone, a physician and surgeon from Dallas, Texas, who testified that he had been in the private practice of medicine since 1919, and had for many years been on the teaching staff at Baylor Medical School. His testimony was based entirely upon a hypothetical question.

The hypothetical question contains a summary of all the evidence offered by the plaintiff. No objection was registered to the hypothetical question or to the testimony of Dr. Touchstone in response thereto. Since the hypothetical question, together with the testimony in response thereto, constitutes the basis of plaintiff's cause of action, we quote the question and answers as follows:

"Q. Doctor, I would like for you to assume that we have a four and half year old child who has fallen down and he has fractured the bottom end, the distal end of the humerus. He has chipped off the condyle and it's floating free. This crying child is brought into the doctor by his parents some fifteen minutes after the break. The doctor, and he's a general practitioner, with no specialty in orthopedic surgery, or general surgery or internal medicine or anything else, a general practitioner. They bring this boy in to this general practitioner's office. The general practitioner determines that the boy still has—He can open and close his fists, his elbow is jerking, but he can move his elbow. Apparently there is still function of the medial and the ulnar nerve and that the doctor checked and he finds a radial pulse. This doctor then xrays it to find that this condyle has been chipped off down here. This doctor puts this arm up in extreme flexed position. First of all, he wraps gauze around the forearm and around the upper arm, he puts a piece of gauze or cotton in here in the bend of the elbow, the ventral side of the hand, if you hold the palm up here, then he pulls this arm up in extreme flexed position and he puts a circular bandage around the elbow. He puts the arm in a sling, he tells the parents to bring the boy back if there is any, or to contact him if there is any swelling or any discoloration. They send the boy home. The boy is brought to the doctor's office about 3 or 4 o'clock in the afternoon. The boy is sent home and the next morning the boy is brought back to the doctor and the boy had extreme pain all night. Now the boy has pain in the elbow when he fractured it, but he has extreme pain that night. He's very uncomfortable, doesn't sleep any. His mother is up with him all night long. They take him back around 9 or 10 o'clock the next morning. The doctor merely lays his pencil on the bandage like this and says everything is all right, but there is swelling and you can see swelling pooching up above the bandage. Then the boy is taken home again and he is still in extreme pain, extreme discomfort, he doesn't sleep at night at all, he's very uncomfortable and finally the parents late the next afternoon called the doctor. The doctor goes out and he looks at the arm and he sees the swelling and tells them to take him to his hospital. The boy is taken to the hospital and the doctor removes the bandage and he finds discoloration and he finds big watery blisters on the forearm and

the upper arm, along with the swelling. At that time there is decreased or diminished flexation of the hand, be the left arm, ex-'treme, not extreme, but decreased or diminished flexation of the hand and the arm. He finds no radial pulse. He then goes in and he determines that there is infection. The boy is running a fever of about 102 or better, 102 to 104. The doctor determines there is infection. Now, that doctor doesn't try to determine what kind of infection it is. He just starts putting antibiotics in there. The boy's arm tends to clear and then several days later, six days later, he calls the orthopedic surgeon and tells him he has a boy over here with this kind of an arm and he wants to refer him to this orthopedic surgeon on a consultive basis to determine if there's future treatment that's necessary. An appointment is made by this doctor with this orthopedic surgeon. The boy was taken over there on the appointed day with the orthopedic surgeon and the orthopedic surgeon then finds the arm in an extended position, not extended out fully, but in an extended position of about 20 degree flexion. He finds there are remnants there of blisters. He finds no ulnar or medial nerve function. He finds no radial pulse and then he commenced to treat the boy's arm at that time and he suspects that a Volkmann's contracture or a Volkmann's ischemia is going to take place. The first doctor, the general practitioner, figured that when he sees the boy the third day after the break and takes the bandage off that there is a constricture of the blood vessels in the elbow and damages to the nerve. Now when the orthopedic surgeon gets the elbow he finds that there is marked blueness and bruises around the elbow. The general practitioner doesn't remember what he saw in regard to the color. He said it was discolored, but he said it was red. Doctor, from that hypothetical situation, could you form an opinion as to what caused the constriction of the blood vessels and the damages to the nerves in the elbow?

"A   Yes, Sir, I can.

"Q   Do you have such an opinion?

"A   Yes.

"Q   What would be your opinion?

"A   When he put that up like that—He didn't mean to do it, but he did it.

"Q   Up in a flexed position?

"A   Yes, and he cut off his blood supply with that tight bandage, on there. That's what happened.

"Q   All right Sir, when he put this cotton in there, what did that do, Doctor?

"A   Made it worse.

"Q   That's where the watery blisters appeared, was on that surface in there. Now then, Doctor, what else—Is that the type of treatment that a medical doctor in this area should have done for the type of injury that the boy was brought to him to treat, the chipped off condyle bone?

"A   Well, I wouldn't think that was the course to follow and think also that he might have gotten a consultant immediately, the following day anyhow to see what procedure to take. I mean the following day after it was done. I believe he still had a radial pulse at that time. Isn't that right?

"Q   Yes, Sir, at the time that the boy was brought in to him he had a radial pulse, when he was first brought in to him.

"A   I think he should have either put the arm in extension until he got the thing all figured out what he was going to do or gotten an orthopedic man to advise him.

"Q   From the treatment that I· have described here to you that the general practitioner did to the boy's arm when he first set that arm, Doctor, is that the type of treatment that the ordinary doctor under the same or similar circumstances would have done, in this area, the type of treatment the boy actually received?

"A I just doubt that many doctors would take a chance on a thing like that. I think the majority of them would ask for help, not later than the second day.

"Q What about putting the arm up in a flexed position? Is that what the ordinary doctor would have done?

"A I don't think so. I think they would have either put sand bags on each side and kept it out until they found out what was going to be necessary to be done. It looks like he might have needed an open operation at the time to fit that end of the bone there that was loose.

"Q All right, Sir, the conduct of the general practitioner on that second morning when they brought the boy back to him and he had seen the swelling there, did not loosen the bandage, is that the kind of treatment that an ordinary practitioner in this area would have done under the same or similar circumstances?

"A I don't believe so.

" * * *

"Q Now then, assuming our four and a half year old boy that he does develop Volkmann's contracture, and the hypothetical that I gave you a while ago and assuming the same facts, could you say whether or not the treatment of the general practitioner in pulling that arm up in a flexed position, putting cotton in the bend of the elbow here and pulling the arm up in a flexed position, and not putting it in an extended position, was the cause of the ultimate Volkmann's contracture that occurred to that boy?

"A I believe so. That would be my opinion.

"Q Doctor, could you state whether or not once Volkmann's contracture has started, it is possible to cure Volkmann's contracture?

"A No.

"Q Once it's started it's irreversible?

"A Yes, Sir."

According to the testimony of plaintiff's parents, Mr. and Mrs. George A. Rose, after Dr. Friddell reduced the fracture, he wrapped gauze around plaintiff's arm at the elbow. They testified that plaintiff had intense pain all night and the following morning they noticed swelling and discoloration. They testified that they took plaintiff back to Dr. Friddell on the morning of May 17th and called his attention to the swelling and suggested that the bandage around the arm was too tight. After an examination, Dr. Friddell assured them that the bandage was not too tight. The plaintiff continued to suffer intense pain and on May 18th, the third day after the break, blisters appeared on his arm and he developed a high fever. Dr. Friddell was called to the home, and upon observing the blisters, advised that plaintiff be taken to the hospital.

Both Dr. Friddell and Dr. Touchstone agree that a Volkmann's contracture will not occur so long as radial pulse is present in the arm. Dr. Friddell testified that when he first saw the plaintiff shortly after his injury on May 16, 1948, plaintiff was suffering from a simple fracture of the bone of the upper arm where it enters the elbow joint. He described it as a supracondylar fracture where the condyle was broken off and floating free. He testified that appellant had movement in the fingers and forearm and had good radial pulse, indicating good circulation. After making x-rays, he testified that he reduced the fracture, put some cotton down in the bend of the elbow joint, and then used tape to tape the forearm to the upper arm so as to hold the elbow at about a 60 degree semi-flexed position. He denied that he wrapped the arm with circular-type tape or bandage. He testified that he advised plaintiff's mother to return in two days or before if swelling or discoloration occurred; that he did not see plaintiff again until May 20, at which time he was called to the home by plain-

tiff's parents; that because plaintiff had some swelling and large watery blisters on the forearm and near the wrist, he advised his parents to take him to the hospital. Upon examination he found that there was some constriction of the circulation of the soft tissues in the forearm and the arm had no radial pulse; that as a result of the large watery blisters, plaintiff had an infection and he immediately began giving him penicillin to combat the infection and fever; that on May 25, the infection and fever had cleared and he referred him to Dr. P. M. Girard, an orthopedic surgeon in Dallas. Throughout his testimony, he maintained he administered proper treatment and he did nothing to cause the Volkmann's contracture. He insisted that the contracture of the blood vessel was caused either by the injury itself or by the formation of a blood clot in the blood vessel which blocked the circulation to the lower arm.

■■ When viewed in a light most favorable to the plaintiff, the evidence shows, without dispute, that plaintiff's arm had good radial pulse after the injury, thus indicating that the blood vessel was not impaired as a result of the injury. The evidence also shows, without dispute, that a tight bandage around the arm is one of the recognized causes of the loss of radial pulse and loss of circulation. Dr. Touchstone testified that in his opinion the treatment administered by Dr. Friddell in placing cotton in the bend of the elbow and drawing the arm up in a flexed position with tight bandages failed to measure up to the required standard of care. He further testified that in his opinion such method of treatment caused the plaintiff to suffer a Volkmann's contracture. This testimony, we think, raises more than just a mere possibility that the injury was caused by the treatment. We think the testimony was of sufficient probative force to present questions of fact upon which reasonable minds could differ. It is not for this court to decide whether the treatment administered by Dr. Friddell was in

fact negligence proximately causing plaintiff's injury. Rather it is for this court to decide whether or not the evidence in the record presents facts which must be passed upon by the jury. As we view it, the record contains at least some evidence of probative force raising an issue of negligence and proximate cause, especially with reference to whether or not the treatment caused a loss of circulation and the resulting Volkmann's contracture. Hart v. Van Zandt, Tex., 399 S.W.2d 791, (1965); Van Der Bie v. Kools, 264 Mich. 468, 250 N.W. 268; Sim v. Weeks, supra; Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1.

Defendant argues that because Dr. Touchstone qualified his opinion by admitting that the contracture could have developed pathologically by the formation of a blood clot, the evidence shows two possible causes of the plaintiff's injury. Consequently, he says that the trial court properly rendered judgment in his favor because the evidence as to causation was speculative and therefore insufficient to support the submission of an issue thereon.

■ We recognize the rule which states that where there are two or more causes which might have produced the injury, for only one of which the defendant is responsible, and there is no evidence to show which cause the injury is actually attributable, a verdict should be directed for the defendant. Bowles v. Bourdon, supra. However, we do not believe the rule goes so far as to require the plaintiff to prove causation by direct and positive evidence which excludes every other reasonable hypothesis. It is generally held that evidence which shows reasonable probability that defendant's negligence or want of skill was the proximate cause is sufficient to raise an issue for the jury. 13 A.L.R.2d 28.

■ The vital inquiry in any case involving proximate cause is whether the negligent act set in motion the natural

and unbroken chain of events that led directly and proximately to a reasonably foreseeable injury or result. Hart v. Van Zandt, supra; Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933, 936. The conflict, if any, between the opposing opinions expressed by Dr. Touchstone became a matter for the consideration of the jury in determining proximate cause.

For the reasons stated, the judgment must be reversed and the cause remanded for a new trial.